UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY PISKURA, *et al*,           )
                                 )
    Plaintiffs,              )
                                 )
v.                               )   Case No. 1:10-cv-00248
                                 )
TASER INTERNATIONAL, INC., *et al*, )
                                 )
    Defendants.              )

*Plaintiffs Highlited Version of*
**DEFENDANT TASER INTERNATIONAL, INC.'S
PROPOSED FINDINGS OF FACT &
CONCLUSIONS OF LAW FOR SUMMARY JUDGMENT**

John R. Maley — jmaley@btlaw.com
Damon R. Leichty — dleichty@btlaw.com
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:  (317) 236-1313
Facsimile:   (317) 231-7433

Michael Brave — brave@laaw.com
Holly Gibeaut — holly@taser.com
Isaiah Fields — isaiah@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, Arizona 85255
Telephone:  (800) 978-2737
                  (480) 905-2000
Facsimile:   (480) 905-2027

*Attorneys for Defendant,
TASER International, Inc.*

## FACTUAL FINDINGS

A.  **TASER International, Inc.—creator of less-lethal tools for law enforcement, including the TASER®[1] X26™ electronic control device.**

1. Since its founding in 1993, TASER International, Inc. ("TASER") has designed, assembled, and marketed electronic control devices (ECDs) that enable law enforcement to protect themselves and others while minimizing the risk of serious injury or death [Ex49¶4].[2]

2. The ECD is designed in probe deployment mode to temporarily incapacitate an individual from a safe distance through brief, low-charge, short duration electrical pulses that block the command and control center of the body and that cause skeletal muscle contractions [*Id.* ¶5].

B.  **The probe application of the TASER X26 ECD.**

3. In 2003, TASER introduced the low-power TASER X26 ECD [*Id.* ¶5].

4. The output voltage for the TASER X26 ECD—what actually enters the body—is only about 1400 to 2520 volts [*Id.* ¶30], with a mean voltage per pulse of 580 volts [*Id.* ¶30; Ex50p1].

5. Voltage itself is not dangerous, as people can receive an electrical static shock from a doorknob of approximately 35,000 volts without harm [Ex49¶30].

6. The ECD's low power source consists of a battery of two small 3-volt commercially available cells (used to power some digital cameras) [*Id.* ¶31].

7. The ECD generates significantly less electrical charge and energy than many medical devices, such as external defibrillators, which are approved and deemed safe for human use [*Id.*].

8. In the field, the state-of-the-art ECD is designed for law enforcement officers to use the device primarily in two ways: (a) probe application, where two probes fire via compressed

---

[1] X26 is a trademark of TASER International, Inc., and TASER® is a registered trademark of TASER International, Inc., registered in the United States.

[2] TASER has compiled all exhibits in one global appendix to which these citations refer.

nitrogen, with electrical impulses transmitted into the subject through trailing wires; or (b) drive-stun mode, where the ECD is physically pressed against the target [*Id.* ¶22].

9. This case involves the allegation that an officer attempted to use the probe mode on Kevin Piskura ("Piskura") for a single trigger-pull duration of 11 seconds.

10. The following diagram [from Ex31] illustrates the TASER X26 ECD as well as its cartridge, wires, and probes involved in this type of application:



Illustration 1

11. The ECD has a cartridge affixed (snapped in place) on the front that contains two metal probes drawing thin insulated wires [Ex31p6; *see also* Illus.1].

12. When deployed, the two probes are propelled with the bottom probe moving at an eight-degree downward angle, which causes the probes to separate a foot for roughly every seven feet they travel from the ECD [Ex31p15].

13. Based on optical microscopy and testing, the wires connecting the probes to the cartridge are extremely thin (127 microns or approximately 0.005 inches in diameter)—smaller than some human hair [Ex7p8].

14. Since the wires only have a tensile strength of 1.5-2.0 pounds, they can be broken in force encounters [Ex7pp13-15].

15. Once the TASER cartridge is deployed (when the probes are launched), there are two exposed fixed electrodes on the front of the ECD [*see* Illus.2—green arrows].

16. If there is no electrical circuit completed by the probes in the subject, the ECD will arc in the open air across the fixed electrodes on the front of the ECD or the expended cartridge [Ex7p36; Dkt69-10,pp16-19; Illus.2].

17. This is the same result as when officers "spark test" the ECD without a cartridge attached [Dkt69-10,p17].

 

Illustration 2

18. In addition to this blue arcing across the fixed electrodes on the front of the ECD or expended cartridge, the absence of a completed, intact electrical circuit qualitatively sounds different and produces a different signal analysis signature [*Id.* pp16-19; Ex1pp20-21].

19. An ECD that has not completed an intact circuit with a person (and instead arcs across the fixed electrodes on the front of the ECD) has 631 times the sound intensity of an ECD with a completed intact circuit through the wires and probes [Dkt69-10,pp16-19].

3

20. Without a completed, intact probe circuit, the ECD arcs across the fixed electrodes on the front of the ECD at 79 decibels at 1 meter; with a completed circuit, an ECD emits a soft click of 51 decibels at 1 meter [Dkt69-10,pp16-19].

21. The scientific difference in sound emitted from an electrical arc has been well studied to distinguish when an ECD has completed a circuit from when it has not [Dkt69-10,pp16-19].

22. It is the arcing of the electrical current through the air at the fixed electrodes on the front of the ECD that creates the blue arcing and loud "crackling" or popping sound [*Id.*].

C. **The need for an intact electrical circuit to deliver an electrical charge to a person.**

23. There must have been a completed electrical circuit to deliver an electrical charge through the wires and probes to Piskura [Dkt69-10,p11; Ex7pp36-37; Ex1p174].

24. For the ECD, just like any other electrical circuit, the current must (1) exit the ECD through the first wire, (2) travel through the first probe attached to the first wire, (3) travel from the first probe into the subject, (4) traverse across the subject's body to the second probe, (5) travel through the second probe to the second wire, and (6) return back through the second wire to the ECD completing the intact circuit capable of delivering an electrical charge to the subject [Ex7pp7-8; Dkt69-10,pp11-19].

25. Numerous independent conditions can prevent the completion or maintenance of an intact electrical circuit capable of delivering an electrical charge from the ECD through the wires and probes to a subject [Dkt69-10,p17]: (a) one or both of the probes miss the subject, (b) one or both probes dislodge from the subject, (c) clothing separates the probe or probes sufficiently from the subject's body, or (d) a wire breaks.

### D. Piskura's incident with law enforcement.

26. At approximately 2:04 a.m. on April 19, 2008, Piskura was involved in a physical altercation at the Brick Street Bar in Oxford, Ohio [Dkt1,¶¶18-19; Dkt71-2,Ex12p114; Dkt71-5,Ex15p45; Dkt69-5,Ex5pp7-9; Dkt69-8,pp15-16; Ex35pp45-55; Ex41p172].

27. According to his friend, Piskura was "out of his mind, blackout drunk" [Dkt71-2,Ex12,p114].

28. Piskura weighed 176 pounds [Ex60p3; Dkt69-8,p8].

29. Experts on both sides agree that Piskura had been binge drinking and had consumed between 18 and 25 drinks that night [Dkt69-5,Ex5pp7-8; Dkt69-8,Ex8p15; Ex36p66:15-24].

30. Thus intoxicated, with a BAC of 0.340, Piskura engaged in an altercation and was removed by bouncers [Dkt71-5,Ex15p45; Dkt69-5,Ex5pp7-9; Dkt69-8,Ex8pp15-16; Ex35pp45-55; Ex41p172].

31. Officer Geoffrey Robinson responded to the scene and observed the altercation [Dkt71-6,Ex16pp174,184; Ex41pp173-81].

32. Officer Robinson attempted to deploy his ECD in probe mode at Piskura to try to subdue him [Dkt71-6,Ex16pp161-74,191].

33. Video of the encounter was taken by a TASER Cam™ [Exs37,46]. The video and still shots have been preserved and illustrate the sequence of events [Exs37,46,47].

34. When Officer Robinson attempted to deploy the ECD toward Piskura, he heard a "very, very loud crackling, continuous popping, crackling noise, much like the same noise you would hear when you spark test or do a spark test of the TASER [ECD]" [Ex41p209].

35. A witness (Mr. Casey Burns) also "heard a crackling, like a sizzle and a crackle kind of noise" and saw blue arcing light for "at least 10 seconds" [Ex42pp46,143].

5

36. Officer Robinson handcuffed Piskura and observed that he was breathing [Ex41p227].

37. When Detective (and EMT) John Jones arrived on scene, Officer Robinson still had not seen signs in Piskura of any medical distress or that indicated there was any medical emergency [Id].

38. Detective Jones measured Piskura's breathing at 6-8 breaths per minute [Ex44p64].

39. Detective Jones also detected Piskura's radial pulse [Ex44p68].

40. Electrically-induced VF would have caused Piskura to lose pulse and respirations immediately (within 5-15 seconds) [Dkt69-3,p13].

41. Piskura went into arrest as the ambulance arrived about 9 minutes after the attempted ECD discharge [Dkt69-3,pp7-9;Dkt69-10,pp9-10;Ex44p137].

42. Piskura was taken to the hospital and died five days later on April 24, 2008 [Ex60].

43. The autopsy and toxicology reports (April 25) confirmed a BAC of 0.319 g/mL from a 3:04 a.m. blood draw (an hour after the incident) [Ex60; Ex8pp154-55; Dkt69-5,p6; Ex36p70:1-9].

44. Toxicology analysis has concluded that Piskura had a 0.340 BAC at the time of the incident [Dkt69-5,p7;Ex34].

45. Alcohol can induce cardiac arrhythmias associated with sudden death, with alcohol being potentially lethal from 0.24 and higher [Dkt71-9,Ex19pp154-55; Ex1p13:11-19; Ex36p41:10-15; Ex36pp22:2-23:7; Ex36p114:4-19; Ex36p23,114; Dkt69-8,pp1-19; Dkt69-5,pp1-9;Ex34; Ex36pp36:6-37:10,41:10-15,114:4-19,22:2-23:7].

E. **Undisputed autopsy and other forensic evidence about the absence of an electrical circuit between the ECD and Piskura.**

46. The medical examiner, Dr. Obinna Raphael Ugwu, testified that he found only one mark on Piskura consistent with an ECD probe [Ex8pp62,63].

6

47. Dr. Ugwu testified that he looked extensively for a second probe mark, but found none [Ex8p130].

48. Plaintiffs' electrophysiologist (Dr. Douglas Zipes) also found only one probe mark on Piskura from the autopsy photographs [Ex1pp169-70].

49. Dr. Zipes agrees there must have been a completed circuit for the ECD to have had any effect on Piskura [Ex1p174].

50. Dr. Zipes cannot say to a reasonable degree of certainty that a second probe connected with Piskura to create a completed circuit, and cannot say to a reasonable degree of certainty that any probe penetrated the epidermis (outer skin) [Ex1pp168-69].

51. Dr. Zipes does not know how close a probe would need to be to complete a circuit [*Id.* p64].

52. Zipes says that, to induce "cardiac capture" in a "pig," the maximum distance a probe can be is 23 millimeters (25.4 mm equals 1 inch) [Ex1pp203-04; *see also Daubert* brief on Zipes].

53. Cardiac capture is *not* the same as VF, however; and Zipes admits this [Ex9p21:17 ("producing VF is a different thing")].

54. Pig hearts are *not* human hearts, as swine fibrillate *more easily* than humans [Ex55pp119-20; Dkt69-4,p11; Dkt69-3,pp16-17; Dkt69-6,pp11-13].

55. Dr. Zipes agrees that the only probe mark he could find was "considerably farther than two centimeters from the right ventricle" of the heart [Ex1p146; *see also* Ex1pp167-68, "it's far from that" and "probably more than two centimeters"].

7

56. On February 22, 2010, Zipes testified that he had not calculated the probability of an ECD causing VF in a human, that the frequency was unknown, that he did not "know how low" the probability was, and that "you can't get accurate probabilities" [Ex2pp43-44,47,137].

57. On December 20, 2010, Zipes testified that he could not state to a reasonable degree of medical certainty the probability of ECD-induced "ventricular arrhythmia" and that he did not "know how low" the probability was [Ex9pp209-10].

58. On July 13, 2011, Zipes testified that the risk of VF from an ECD is "incalculable" [Ex6p655:6].

59. On December 21, 2011, Zipes again testified that the likelihood of an ECD causing VF, cardiac arrest, or lethal cardiac consequences in a human was "incalculable" [Ex5pp140-41].

60. Zipes later confirmed in this case that, as of January 3, 2012, the likelihood of negative cardiac consequences from an ECD cannot be accurately determined and "is not calculable" [Ex1p114].

61. In contrast, Plaintiffs' pharmacologist (Nelson) admits that (even assuming his data is true) the "fair probability" of Piskura's death from alcohol toxicity is between 1:1,000 and 1:10,000 [Ex36p118:7-21].

62. Consistent with the autopsy findings, the undisputed TASER Cam video (including still frames) of the incident shows that there were not two ECD probes in Piskura to complete a circuit [Exs37,46].

63. Undisputed forensic video analysis of that video has verified the absence of two probes to complete an electrical circuit capable of delivering a charge to Piskura [Exs37,46,47pp1-17; *see also* Daubert motion on Charles and Mary Piskura, and images therein].

8

64. Undisputed metallurgic analysis of the probes and ECD cartridge wires has shown that the wires were broken, and not capable of delivering an electrical charge to Piskura [Ex7pp12-37; Dkt69-10pp11-19].

65. Undisputed qualitative signal analysis of the ECD also has shown that there was an open circuit, not a completed circuit capable of delivering an electrical charge to Piskura [Dkt69-10,pp16-19].

66. Undisputed optical microscopy and scanning electron microscopy of the 12 wire ends from the ECD have shown that there was no arcing at the wire ends, which, coupled with probe analysis, establishes that they were not part of an intact completed electrical circuit capable of delivering a charge to Piskura [Ex7pp12-37].

## CONCLUSIONS OF LAW

1. The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make [a] showing with significantly probative evidence." *Goldstein v. D.D.B. Needham Worldwide, Inc.*, 740 F. Supp. 461, 464 (S.D. Ohio 1990) (Weber, J.).

2. The party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Reece v. Astrazeneca Pharms., LP*, 500 F. Supp.2d 736, 746 (S.D. Ohio 2007) (Weber, J.). The non-movant "must show that a genuine issue of material fact exists as to each element" of his claim. *Burns v. City of Columbus*, 91 F.3d 836, 843 (6th Cir. 1996).

3. The facts and justifiable inferences must be drawn in the non-movant's favor, *see id.*, but to raise a genuine issue of material fact sufficient to avoid summary judgment, a party's evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9

4. To forestall summary judgment, the nonmoving party must set forth more than a mere "scintilla of evidence." *Anderson*, 477 U.S. at 252. Evidence that is "merely colorable" or "not significantly probative" is not sufficient. *Reece*, 500 F. Supp.2d at 746.

5. Plaintiffs have pursued a "product liability claim" governed by the Ohio Product Liability Act. *See* O.R.C. §§2307.71 *et seq.*

6. Although alleged in their complaint, Plaintiffs have not adduced evidence to establish any element of their allegation that there was either a design or manufacturing defect under O.R.C. §§2307.74, 2307.75.

7. Plaintiffs allege that TASER failed to provide adequate warnings with its product, but they have not established a genuine issue of material fact on the issue of causation.

8. Ohio Revised Code §2307.76 declares a product defect due to an inadequate warning so long as (among other things) the "manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages."

9. In short, Plaintiffs must show causation. When "evidence of the issue of proximate cause requires mere speculation and conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006).

10. The undisputed forensic, video, signal, metallurgic, and microscopic evidence, as supported by witness testimony from Mr. Casey Burns and Officer Robinson, is unanimous that at least one probe from the ECD missed Piskura and there was no intact completed electrical circuit capable of delivering an electrical charge from Officer Robinson's ECD to Piskura.

11. While Plaintiffs have advanced a theory, albeit unsubstantiated, *see Anderson*, 477 U.S. at 252, the videotape particularly cannot be disputed as a matter of law. *See Scott v. Harris*, 550 U.S.

372, 379 n.5, 380 (2007) (court "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"); *Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011) ("we reject [] allegations to the extent they are clearly contradicted by a videotape capturing the events in question").

12. Also, as an independent basis, Plaintiffs have not produced anything more than a scintilla of evidence to support the risk or cause they theorize existed in this case. Even taking the facts and inferences in their favor, their risk is one that, like *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362-64 (6th Cir. 2011), borders on legal insignificance. The Sixth Circuit in *Hirsch* granted summary judgment under similar facts.

13. In addition, and as another independent basis, Plaintiffs have not tendered reliable expert testimony on causation. See Fed.R.Evid. 702; *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993). The absence of expert causation testimony requires summary judgment. *See, e.g., Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) (medical expert required to establish causation); *Terry v. Caputo*, 875 N.E.2d 72, 79-80 (Ohio 2007) (requiring expert testimony).

14. As a fourth independent basis, even if Zipes' testimony could be considered somehow reliable, which it is not, and even if the analytical gaps between cardiac capture and VF, and pig hearts and human hearts could be surmounted, among the many other problems with his testimony, his theory requires the presence of probes within 23 mm, and the facts are undisputed (based on his own admissions) that these circumstances are not present in this case.

15. The OPLA preempts the remaining claims that Plaintiffs have pursued. When the 2005 version of the OPLA was enacted, it abrogated all common law claims relating to product liability claims. *See Wimbush v. Wyeth*, 619 F.3d 632, 637 (6th Cir. 2010) (OPLA "abrogate[d] *all* common law product liability causes of action"); *Evans v. Hanger Prosthetics & Orthotics, Inc.*, 735 F. Supp.2d 785, 795 (N.D. Ohio 2010) (same); *see also* O.R.C. §2307.71(B) (stating as much).

16. The remaining common law claims in counts 3-6 have been abrogated by statute, including negligence, misrepresentation, alleged reckless conduct, and survivorship.[3] *See, e.g., Wimbush*, 619 F.3d at 639 (negligence claim abrogated so long as brought after 2005); *Evans*, 735 F. Supp.2d at 795 (abrogating negligence and separate count for punitive damages); *Delahunt v. Cytodyne Tech.*, 241 F. Supp.2d 827, 842-44 (S.D. Ohio) (dismissing negligence and other common law product claims); *Thompson v. Sunbeam Prods., Inc.*, 2011 U.S. Dist. Lexis 110677, 42-45 (S.D. Ohio 2011) (granting summary judgment on variety of common law claims as preempted by OPLA); *Deacon v. Apotex Corp.*, 2008 U.S. Dist. Lexis 113203, 6-12 (S.D. Ohio 2008) (dismissing survivorship claim as subsumed by OPLA).

17. The product liability claim here must be brought under the OPLA. The OPLA covers claims for manufacturing, design, misrepresentation, and warnings defects. *See* O.R.C. §§2307.74-.77. Summary judgment should be entered for TASER on all common law claims as a matter of law based on the OPLA's preemption.

18. Even without preemption, the absence of evidence on causation requires summary judgment on all claims in this case.

19. Because no claims survive, there is no basis to award punitive damages. In any event, there is no genuine issue for a fact-finder that TASER's actions "demonstrate malice or aggravated or egregious fraud" to justify punitive damages. *See* O.R.C. §2315.21(C)(1).

20. Summary judgment must, therefore, be entered for TASER on all claims.

---

[3] The survivorship claim in count 6 also is merely derivative of the principal claims. If there are no other claims, the survivorship claim must also be dismissed. *See, e.g., Stratford v. Smithkline Beecham Corp.*, 2008 U.S. Dist. Lexis 84826, 26 (S.D. Ohio 2008).

Respectfully submitted,

*s/ John R. Maley*
John R. Maley — jmaley@btlaw.com
Damon R. Leichty — dleichty@btlaw.com
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone:     (317) 236-1313
Facsimile:     (317) 231-7433

Michael Brave — brave@laaw.com
Holly Gibeaut — holly@taser.com
Isaiah Fields — isaiah@taser.com
TASER International, Inc.
17800 North 85th Street
Scottsdale, Arizona 85255
Telephone:     (800) 978-2737
               (480) 905-2000
Facsimile:     (480) 905-2027

*Attorneys for Defendant,*
*TASER International, Inc.*

## CERTIFICATE OF SERVICE

The above signed attorney hereby certifies that a copy of the foregoing was served this 12th day of April, 2012, through the Court's ECF system to all counsel of record.

INDS02 1215587v1

**CERTIFICATE OF SERVICE**

The above-signed hereby certify that a copy of the foregoing was served this 19th day of September, 2012, through the Court's ECF system to all counsel of record.

/s/ PETER M. WILLIAMSON