**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARY PISKURA, *et al.*,
Plaintiffs,

v.

TASER INTERNATIONAL, *et al.*,
Defendants.

Case No. 1:10-cv-248

Weber, J.
Litkovitz, M.J.

**ORDER AND REPORT AND RECOMMENDATION**

This civil action is before the Court on defendant Taser International's (TASER) motion for summary judgment and supporting brief (Docs. 84, 103), plaintiffs' brief in opposition (Doc. 123), and Taser's reply brief. (Doc. 137). This matter is also before the Court on TASER's motion to exclude plaintiffs' expert Dr. Zipes and its brief in support (Docs. 105, 106), plaintiffs' brief in opposition (Doc. 124), and TASER's reply (Doc. 138), and TASER's motion to submit supplemental authority in support of their summary judgment motion (Doc. 145) and plaintiffs' response in opposition. (Doc. 146). On August 15, 2012, the undersigned held oral argument on the pending motions. (Doc. 139). As TASER's summary judgment motion relies, in part, on the arguments presented in its motion to exclude the testimony of Dr. Zipes, the Court will first address the motion *in limine*.

For the reasons stated below, TASER's motion to submit additional authority is granted, TASER's motion to exclude Dr. Zipes' testimony is denied, and the undersigned recommends that TASER's motion for summary judgment be granted in part and denied in part.

## I. Factual and Procedural History

The instant lawsuit arises from the death of Kevin Piskura (Piskura) in April 2008. The administratrix of Piskura's estate and his next of kin (plaintiffs) brought a 42 U.S.C. § 1983

claim against the Oxford Defendants[1] alleging that Piskura's death resulted from an unreasonable use of force, specifically the use of a taser on Piskura's chest. As the Oxford Defendants have been dismissed, the remaining claims against TASER are state law claims of Wrongful Death/Statutory Product Liability under §§ 2307.74, 2307.75, and 2307.76 of the Ohio Product Liability Act (OPLA); Wrongful Death, Common Law Negligence and Product Liability; Wrongful Death/Intentional and Negligent Concealment and Misrepresentation; Wrongful Death/Reckless, Willful and Wanton Misconduct; Survivorship; and Loss of Consortium. (Doc. 1).[2]

A. Undisputed Facts

1. Plaintiffs, Mary Piskura and Charles Piskura, are residents of the State of Ohio and the next of kin of Piskura.

2. Defendant, TASER, is a Delaware Corporation with its principal place of business in the State of Arizona. (Doc. 27, ¶ 14, TASER's Answer to Plaintiffs' Complaint).

3. TASER designs, manufactures, fabricates, markets, sells and distributes, Electronic Control Devices (ECDs), including the X26 model. (*Id*.).

4. ECDs are designed for two methods of application by law enforcement officers in the field: (a) probe application, where two probes fire via compressed nitrogen, with electrical impulses transmitted into the subject through trailing wires; or (b) drive-stun mode, where the ECD is physically pressed against the target. (Doc. 142, ¶ 8).[3]

5. In order for the X26 ECD to deliver an electrical charge to a person, there must have been a completed electrical circuit. (Docs. 103 at 5; 142, ¶¶ 23, 49).

6. On April 19, 2008, Piskura was at Brick Street Bar in Oxford, Ohio. (Docs. 103 at 6; 123 at 7).

[1] The Oxford Defendants were dismissed by plaintiffs pursuant to a February 12, 2012 Stipulation of Dismissal. (Doc. 75).

[2] Although no federal claims remain, the Court retains diversity jurisdiction over this matter under 28 U.S.C. § 1332.

[3] In support of their respective briefs, both TASER and plaintiffs filed numerous exhibits which are identified by the parties' unique numbering systems. For purposes of clarity, this opinion refers to all exhibits by their Electronic Case Filing (ECF) system docket numbers. Where a specific page number of an exhibit is cited, it refers to the ECF document page number as opposed to any other pagination scheme.

7. Piskura had been drinking alcohol over the course of several hours. (*Id*.).

8. At approximately 2:00 a.m., Piskura was escorted out of the bar by security. (Docs. 103 at 6-7; 123 at 7).

9. Once outside, Piskura encountered an Oxford Police Officer, Officer Robinson, who had responded to the scene pursuant to a call. (Docs. 103 at 7; 123 at 7).

10. Officer Robinson deployed his ECD X26 in probe application mode at Piskura. (Doc. 103 at 7; Doc. 123 at 8).

11. After Officer Robinson deployed the ECD, Piskura fell to the ground. (*Id*.).

12. Piskura experienced cardiac arrest.

13. Piskura was taken to the hospital and died 5 days later. (Doc. 93, Ex. 7).

## II. TASER's Motion to Exclude Dr. Zipes' Testimony (Doc. 105)

### A. Motion *In Limine* Standard

The Court has the discretion to rule on an evidentiary motion *in limine* pursuant "to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). "The purpose of a motion *in limine* is to allow the Court to rule on issues pertaining to evidence in advance of trial in order to avoid delay and ensure an even-handed and expeditious trial." *Morrison v. Stephenson*, No. 2:06-cv-283, 2008 WL 5050585, at *1 (S.D. Ohio Nov. 20, 2008) (citing *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp.2d 844, 846 (N.D. Ohio 2004) (internal citations omitted)).

Courts are generally averse to excluding evidence *in limine* because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). A party seeking the exclusion of evidence must demonstrate that the evidence is clearly inadmissible on all potential grounds. *See Ind. Ins.*

*Co.*, 326 F. Supp.2d at 846; *Koch*, 2 F. Supp.2d at 1388; *cf. Luce*, 469 U.S. at 41. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.*, 326 F. Supp.2d at 846.

B. The *Daubert* Standard and Expert Witnesses

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court has a "gatekeeping role" to screen expert testimony and judges have discretion to determine whether such testimony is admissible, depending on its reliability and relevance. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-97 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Newell Rubbermaid, Inc. v. The Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). "[T]he law grants the [court] broad latitude" in analyzing and determining the reliability of proffered expert witness testimony. *Kumho*, 526 U.S. at 139, 142. "The inquiry [under Rule 702] is a flexible one[,]" and its focus "must be solely on principles and methodology, not on the conclusions [the expert] generate[s]." *Daubert*, 509 U.S. at 594-95. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id.* at

592–593. The *Daubert* court set forth four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Id*. at 593-94. This is a flexible test, however, and these enunciated factors do not constitute a "definitive checklist or test," but must be tailored to the facts of a particular case. *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593).

C. Analysis

In his expert opinion report, Dr. Zipes concludes that "[a] Model X26 [taser] discharge can cause cardiac arrest by capturing the cardiac rhythm at very rapid rates, and precipitating ventricular tachycardia or ventricular fibrillation (VF), as shown in animal testing and human reports." (Doc. 111, Ex. 5 at 56). With regard to the cause of Piskura's death, Dr. Zipes opines that "[t]he temporal relationship of [Piskura's] collapse to the Model X26 shocks in the absence of any plausible alternative explanation for his heart to fibrillate at that precise moment demonstrates that the ECD's electrical current directly caused [Piskura's] cardiac arrest[,]" and, further, that "to a high degree of medical certainty [Piskura] developed [VF] as a result of the X26 shocks that he received, which led directly to his death." *Id*. at 56-57. Dr. Zipes' opinion is "expressed to a reasonable degree of medical certainty, based on [his] education, clinical practice, research, training, experience, literature review, document review, and generally accepted principles of medicine and clinical science." *Id*. at 56.

TASER urges the Court to exclude plaintiffs' causation expert, Dr. Zipes, from testifying at trial with regard to his opinion that Piskura died as a result of being tased in his chest for the

following reasons: (1) Dr. Zipes is not an expert on the effects of electronic control device (ECD) electrical current on the human body; (2) Dr. Zipes' theory is unsupported by the evidence and does not meet the *Daubert* criteria for reliability; and (3) Dr. Zipes' methodology fails to address contradictory research. In opposition, plaintiffs assert that Dr. Zipes has the necessary technical background to assist the jury's understanding of the issues in this case; that Dr. Zipes applied accepted scientific and medical principles and methodologies to the issues presented; and that Dr. Zipes' conclusions about ECD risks have since passed peer review. Plaintiffs also contend that TASER's arguments go to the weight of Dr. Zipes' opinion and proffered testimony rather than to their admissibility. For the following reasons, the undersigned finds that Dr. Zipes is qualified to provide expert opinion testimony on whether Piskura died as a result of being tased.

Dr. Zipes' scientific knowledge, experience, training, and education demonstrate that he can assist the trier of fact in understanding the evidence and in resolving the causation issue in this case – whether Piskura died as a result of being tased in the chest. Fed. R. Evid. 702. Dr. Zipes is a preeminent scholar in the field of electrophysiology, the study of the heart's electrical system that focuses on the electrical impulses that regulate heart rhythm. He is board certified in internal medicine and cardiovascular diseases and was board certified in clinical cardiac electrophysiology until 2005, at which point he let his certification lapse as he was no longer performing invasive procedures. Dr. Zipes received his medical degree cum laude from Harvard Medical School and performed his post-graduate training in internal medicine and cardiology at Duke University Medical Center. Further, he has served as a Professor of Medicine and Pharmacology and Toxicology at the Indiana University School of Medicine, where he achieved the status of Distinguished Professor, the University's highest post for academic

accomplishment. He later became Director of the Division of Cardiology at the Krannert Institute of Cardiology. Dr. Zipes has published over 800 medical articles and 21 textbooks, including texts on cardiac electrophysiology and cardiovascular medicine generally. He is a member of editorial boards of over 15 cardiology journals and the founding editor-in-chief of the *HeartRhythm* (the official journal of the Heart Rhythm Society), *Contemporary Treatments in Cardiovascular Disease*, and *Cardiology in Review*, *Journal of Cardiovascular Electrophysiology*; he also served as editor-in-chief of *Progress in Cardiology*. Dr. Zipes is a member of various professional societies and previously served as the president of the Association of University Cardiologists and the Cardiac Electrophysiology Society. He has consulted for and been on the review committees of the American Heart Association and the National Institutes of Health. Moreover, Dr. Zipes was a founding member and later became president of the Heart Rhythm Society. *See* Doc. 111, Ex. 5 at 2-10. Dr. Zipes' education, experience, and qualifications provide an adequate foundation for him to answer the causation question in this case. Fed. R. Evid. 702; *see also Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997).

TASER argues in its motion that while Dr. Zipes may be an expert in *internal* stimulation with pacemakers and implantable cardioverters, Dr. Zipes is not an expert in *external* electrical stimulation of the human body, contending that Zipes has never published on the alleged human effects of ECDs. (Doc. 106 at 6). However, subsequent to the filing of TASER's motion, Dr. Zipes' conclusions cleared peer review and were published in *Circulation*, the Journal of the American Heart Association. *See Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device*, 125 Circulation 2417-422 (2012) (Doc. 119, Ex. 6). That publication includes findings based "on 8 cases of sudden cardiac arrest/death [in

humans] following ECD shocks" and data from animal studies, supporting the reliability of Dr. Zipes' hypothesis that "ECD shocks from a TASER model X26 delivered via probes to the chest can cause cardiac electrical capture." *Id*.[4]

Dr. Zipes' opinions are relevant to, and will assist the trier of fact in understanding the evidence related to, the determination of the cause of Piskura's death. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. The issue of causation is one that implicates difficult questions of medical science that most likely go beyond the common knowledge of lay jury-members. Further, Dr. Zipes' opinions are reliable under the factors enunciated in *Daubert* for the admission of expert testimony. Specifically, Dr. Zipes' conclusion that X26 taser discharges can capture the cardiac rhythm and lead to VF, a precursor to cardiac arrest, is a tested theory that is based on peer-reviewed research and case reports identified and discussed in his expert report. *Daubert*, 509 U.S. at 593-94; Doc. 111, Ex. 5 at 17-23. While TASER correctly notes Dr. Zipes is unable to set forth a potential rate of error and that his theory is based primarily on animal studies and has not been tested on humans, it is not necessary that his opinions meet each of the *Daubert* factors to be admissible. *See Kumho*, 526 U.S. at 150-51 (noting that the *Daubert* factors are intended to be helpful, not definitive, and may not apply in every case). Moreover, these purported deficiencies of Dr. Zipes' opinion cited by TASER go to the weight that should

---

[4] As Dr. Zipes explained in his expert report:

> The heart's natural sinus rhythm (each heart beat originates in the sinus node of the heart) can be taken over by an external electrical source. Electrophysiologists call this phenomenon "cardiac capture" because an external electrical source is actually taking control of ("capturing") the heart's electrical system away from the sinus node and controlling the beats. Animal studies establish that the X26 can capture the cardiac rhythm when the darts are close to the heart, and the current travels in a line more or less across or near the heart. This has been confirmed in humans on multiple occasions, and is obviously what happened here.

(Doc. 111, Ex. 5, ¶ 36).

be afforded to his testimony – not its admissibility. *See Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 182 (6th Cir. 2009) (weaknesses in an expert's methodology "affect the weight that his opinion is given at trial, but not its threshold admissibility."); *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir. 1993) (internal citations omitted)). In light of the above, TASER's argument for excluding Dr. Zipes' testimony on the basis of a lack of supporting human-based studies is unpersuasive.

Here, Dr. Zipes has sufficiently explained the bases for his opinions and distinguished contradictory studies, some of which were funded by TASER.[5] Notably, with respect to the scarcity of results supporting his conclusions from human studies, Dr. Zipes' explanation that human testing is limited by ethical considerations (such as being ethically precluded from inducing cardiac arrest in human subjects) is persuasive and well-taken. In light of the above, the undersigned finds that Dr. Zipes' opinions and methodology pass muster under *Daubert*.[6] This determination is further supported by recent decisions from other courts faced with similar arguments from TASER holding that Dr. Zipes is qualified to testify as an expert witness on similar matters. *See Rich v. Taser Int'l, Inc.*, No. 2:09-cv-2450, 2012 WL 1080281 (D. Nev. Mar. 30, 2012); *Fontenot v. Taser Int'l, Inc.*, No. 3:10-cv-125, 2011 WL 2535016 (W.D. N.C.

---

[5] In its motion for summary judgment, TASER cites to several research studies on the effects of ECDs on humans, none of which "produced VF or other lethal cardiac consequences . . . ." (Doc. 103 at 15). Of the nine studies cited, four were supported and/or funded by TASER. *See* Doc. 87, Ex. 1 at 6; Doc. 87, Ex. 2 at 1; Doc. 87, Ex. 3 at 2; Doc. 87, Ex. 5 at 1.

[6] The Court's finding is based on its analysis of Dr. Zipes' qualifications under *Daubert* and Fed. R. Evid. 702. TASER's further arguments, that Dr. Zipes opinion is inadmissible due to TASER's assertions that the ECD deployed did not complete an electrical current capable of capturing Piskura's cardiac rhythm or under the Sixth Circuit's rationale set forth in *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359 (6th Cir. 2011), are addressed in Section

June 27, 2011); *Butler v. Taser Int'l, Inc.*, No. cv 161436 (Sup. Ct. Cal. Mar. 15, 2010).[7]

Lastly, to the extent that TASER argues that Dr. Zipes opinion should be excluded because contrary evidence exists which undermines his conclusions, this is not a basis for excluding his testimony. Rather, these contentions go to the ultimate weight that the jury should give to Dr. Zipes' testimony in light of the evidence as a whole. *See Best*, 563 F.3d at 182; *McLean*, 224 F.3d at 801. As the Supreme Court explained in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. 596. Should this matter go to trial, TASER will have the opportunity to present its contradicting evidence and to cross-examine Dr. Zipes and the jury will make the ultimate determination as to what evidence to credit.

For these reasons, the Court hereby denies TASER's motion to exclude plaintiffs' causation expert Dr. Zipes (Doc. 105).

## III. TASER's Motion for Summary Judgment (Doc. 84)

### A. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

III. B(1), *infra*, in connection with TASER's summary judgment motion.

[7] The California State Court opinion is included as an exhibit in plaintiffs' Global Appendix. *See* Doc.

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield*, 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and, accordingly, will apply the substantive law of the state of Ohio in analyzing plaintiff's state law claims. *See Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496 (1941); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001).

---

120, Ex. 3.

B. Analysis

TASER has moved for summary judgment on all of plaintiffs' claims asserting that: (1) plaintiffs cannot establish the requisite causation relationship for proving their products liability claim, *i.e.*, that Piskura's death resulted from being tased; (2) plaintiffs' common law negligence claims are abrogated by Ohio's codified product liability laws; (3) plaintiffs' claims for punitive damages are unsupported by evidence; and (4) plaintiffs' have no evidence to support a manufacture or design defect claim against TASER. At oral argument, TASER further maintained that plaintiffs' failure to comply with the District Judge's procedural requirements for the filing of dispositive motions (*see* Doc. 24)[8] requires a finding of summary judgment in its favor because its Proposed Statement of Facts (Doc. 104) should be deemed "established" due to plaintiffs' failure to properly rebut them. The Court will first address TASER's procedural argument before turning to the merits-based arguments enumerated above.

The undersigned declines to recommend that the instant motion for summary judgment be granted based solely on plaintiffs' procedural misstep. First, the Court notes that at oral argument, plaintiffs' counsel acknowledged this oversight and explained that plaintiffs' version of the proposed findings of fact was not filed due to a failure in communication with local counsel's office. Counsel offered a copy of the document during that hearing, which was subsequently filed through the Court's electronic filing system by Court personnel. It is clear

[8] The Court's Pre-trial Procedures require that 23 days after a party is served with Proposed Findings of Fact and Conclusions of Law supporting a dispositive motion, that party shall file with the Court and serve with its Response to the dispositive motion a copy of the Proposed Findings of Facts and Conclusions of Law underlined in the following manner:

a) Underline in **BLUE** those Findings of Fact which are true;
b) Underline in **YELLOW** those Findings of Fact which are true but irrelevant or unimportant;
c) Underline in **RED** those Findings of Fact which are not true; and
d) Underline in **RED** any misstatement of law contained in the Conclusions of Law.

from the briefs filed by the parties and their arguments at the hearing what specific facts remain in dispute. Moreover, the interests of justice would not be served by granting TASER's motion on the grounds of a procedural error. "[C]ases should, as far as possible, be determined on their merits and not on technicalities." *Cooper v. American Emp. Ins. Co*., 296 F.2d 303, 306 (6th Cir. 1961). *See also United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 846 (6th Cir. 1983) ("Trials on the merits are favored in federal courts. . . ."). In light of these circumstances and the relevant policy considerations, and in the absence of any showing of prejudice by TASER, the undersigned finds that plaintiffs' failure to adhere to the Court's procedural rules does not warrant a grant of summary judgment in favor of TASER.

Applying this same rationale to a related matter, the undersigned overrules TASER's objection to plaintiffs' filing of the Highlighted Proposed Statement of Facts. (Doc. 143). Again, the Court accepts plaintiffs' counsel's representations that the failure to file this document earlier was merely an oversight and that it was always plaintiffs' intent for it to be timely filed. The Court anticipated that the document would be filed shortly thereafter. When it was not, plaintiffs' counsel was contacted and he informed the Court that he was unable to file the document due to an error with the electronic filing system. The Clerk of Court then filed the document on plaintiffs' behalf in the interest of having a complete record. For these reasons and in the interest of deciding this matter on the merits and not on a procedural error, the undersigned overrules TASER's objection.

The Court now turns to the substantive arguments raised in TASER's summary judgment motion.

1) *Genuine Issues of Material Fact Exist with Regard to the Causation Element of Plaintiffs' Claims.*

Plaintiffs seek to hold TASER liable under § 2307.76 of the OPLA, claiming that TASER's failure to provide adequate warnings on the cardiac risks of shooting the X26 ECD device at an individual's chest was the proximate cause of Piskura's death.

Under Ohio Rev. Code § 2307.76, a product is rendered defective by virtue of inadequate warnings or instruction if:

> At the time of marketing if, when it left the control of its manufacturer, both of the following applied:
>
> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>
> (b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

Ohio Rev. Code § 2307.76(A)(2)(a)-(b). To establish a "failure to warn" claim, "plaintiffs must prove '(1) a duty to warn against reasonably foreseeable risks; (2) breach of this duty; and (3) an injury that is proximately caused by the breach.'" *Miller v. ALZA Corp.*, 759 F. Supp.2d 929, 934 (S.D. Ohio 2010) (quoting *Graham v. Am. Cyanamid Co.*, 350 F.3d 495, 514 (6th Cir. 2003)).

In the instant matter, TASER does not dispute it has a duty to warn against reasonably foreseeable risks associated with the X26 ECD. Rather, TASER maintains that summary judgment in this matter is appropriate because plaintiffs are unable to establish the requisite

proximate causation element of their OPLA claim.[9] Put simply, TASER asserts that plaintiffs have not proffered admissible evidence demonstrating that Piskura received an electrical shock from the X26 ECD utilized by Officer Robinson on the morning of April 19, 2008 capable of disrupting his heart rhythm and, consequently, are unable to demonstrate the causal link between the use of a taser and Piskura's death. TASER raises four distinct points with respect to their causation argument: (1) there is no expert or other evidence establishing that an intact electrical circuit capable of delivering an electrical charge to Piskura was completed; (2) there is no evidence that there was a taser probe sufficiently close enough to Piskura's heart to support a factual finding that the taser induced VF in Piskura; (3) the causation theories propounded by plaintiffs' expert are "incalculable" and, thus, legally insignificant pursuant to Sixth Circuit precedent; and (4) plaintiffs are unable to proffer admissible expert testimony establishing causation.[10] The Court will address each of these enumerated arguments in turn.

a. Genuine issues of material fact exist with respect to whether an electrical circuit was completed capable of delivering an electrical charge to Piskura.

Both parties concur that in order for Piskura to have received an electrical charge from the taser deployed by Officer Robinson there must have been a completed electrical circuit. (Doc. 142, ¶ 23). TASER contends that plaintiffs' claim fails because the evidence does not support a finding the taser deployed by Officer Robinson completed an electrical circuit. In support, TASER presents the following evidence supporting their position that one of the probes from the ECD did not make contact with Piskura, that no electrical circuit was completed, and

[9] To recover compensatory damages for a claim raised under §§ 2304.74, 2307.75, or 2307.76 of the OPLA, plaintiffs must establish by a preponderance of the evidence that TASER's X26 ECD was the proximate cause of their injury. *See* Ohio Rev. Code § 2307.73.

[10] The final causation argument put forth by TASER, regarding the inadmissibility of plaintiffs' causation expert, presupposes a finding that their motion *in limine* to exclude Dr. Zipes' testimony (Doc. 105) will be granted.

thus, Piskura's death could not have resulted from receiving an electrical shock from the X26 device:

- Darko Babic, TASER's retained engineering, materials, and metallurgical expert, inspected and tested the X26 device used on Piskura, including the wires and probes, using optical microscopy and scanning electron microscopy. (Doc. 86, Ex. 1, Expert Report of Darko Babic). After analyzing these materials, Mr. Babic noted that some of the wires were broken while others were contained within insulation and, consequently, the only way the taser wires used on Piskura could have completed an electrical circuit capable of delivering a charge was if electricity bridged the gap between the air gap created by the insulation.[11] Mr. Babic opined that because the inspected wires did not have the sort of demarcations attributable to arcing, the tips on the available wire portions did not conduct electricity and, consequently, no electrical circuit was completed from the ECD used on Piskura. *Id*. at 36-37.

- Mark Kroll, TASER's tendered bioelectrical expert, reviewed the video and still frames from the X26 device used by Officer Robinson and based on his review opined that: (1) at least one probe did not strike Piskura and, thus, no electrical circuit was completed and no current was delivered and (2) the noise heard on the taser Cam video is of an open circuit taser deployment, indicating that no intact electrical circuit was created capable of delivering an electric charge to Piskura. (Doc. 69, Ex. 10 at 13-19, Expert Report of Mark Kroll).

- Grant Fredericks, TASER's retained forensic video analyst, examined the video and still frames from the X26 used by Officer Robinson and opined that the video does not show two ECD probes striking Piskura. (Doc. 92, Ex. 1 at 2, 7-9, Expert Report of Grant Fredericks). *See also* Doc. 90, Ex. 3 (still images from taser Cam video); Doc. 91, Ex. 6 (manually filed taser Cam video).

- Officer Robinson's testimony characterizing the sound of the ECD exactly like that of the spark test officers perform on their ECDs – which occurs without a completed circuit through the wires and probes: "very, very loud crackling, continuous popping, crackling noise, much like the same noise you would hear when you spark test or do a spark test of the TASER." (Doc. 91, Ex. 1 at 22, Deposition of Geoffrey William Robinson).

- Witness Casey Burns' testimony that he "heard a crackling, like a sizzle and a crackle

---

However, as explained in Section III (B), *infra*, the undersigned has recommended that this motion be denied.

[11] This phenomena is referred to as "arcing," which is the first of two phases the X26 device cycles through to deliver an electrical charge to an individual. (Doc. 120, Ex. 5 at 5, X26 Operating Manual). "[T]he 'Arc Phase' is optimized to generate a very high voltage to penetrate clothing, skin or other barriers. [It] is a very high voltage short duration pulse that can arc through up to 2 inches of clothing or barriers. Once the arc is created, the air in the arc is ionized and becomes a low impedance electrical conductor that conducts the second pulse phase into the body." *Id.*

kind of noise" and observed blue arcing light for "at least 10 seconds[,]" which is inconsistent with a completed circuit. (Doc. 91, Ex. 2 at 3-4, Deposition of Casey Burns).

- Dr. Ugwu's testimony that he looked extensively for a second probe mark but only found one mark on Piskura that he believed was consistent with an ECD probe mark. (Doc. 86, Ex. 2 at 7-8, 16, Deposition of Obinna Raphael Ugwu, M.D., the forensic pathologist who conducted Piskura's autopsy).

- Dr. Zipes' testimony that he only identified one probe mark when examining photographs of Piskura's body. (Doc. 85, Ex. 1 at 54-55, Deposition of Douglas P. Zipes, M.D., plaintiffs' tendered electrophysiology expert).

In opposition, plaintiffs contend that evidence exists which contradicts TASER's experts' opinions and which supports a finding that the taser deployed by Officer Robinson completed a circuit and delivered an electrical current to Piskura, resulting in cardiac capture and, ultimately, Piskura's death. Specifically, plaintiffs identify the following factual and circumstantial evidence as establishing that a genuine issue of material fact exists on whether the ECD probes made sufficient contact with Piskura to complete an electrical circuit:

- Officer Robinson deployed his taser at Piskura's "center mass" from a distance of 1.5 to 3 feet, suggesting that it would have been difficult for the taser to miss striking Piskura's chest. (Doc. 114, Ex. 3 at 33) (Deposition of Geoffrey William Robinson).

- After Officer Robinson deployed the taser, Piskura dropped to the ground instantly, which is consistent with someone who had become incapacitated after being struck by the probes of an ECD. (Doc. 114, Ex. 3 at 31-32).

- Officer Jones believed Piskura had been tased by Officer Robinson because he saw wires going to the front of Piskura's chest. (Doc. 116, Ex. 5 at 12) (Deposition of John Allen Jones, an Oxford Police Officer present at the scene of the incident).

- Officer Jones' Incident Report includes the statement: "I noticed that the taser probes were stuck in the suspect's chest area." (Doc. 116, Ex. 6) (Officer Jones' Incident Report).

- Treatment notes from Dr. Horn, the McCullough Hyde Hospital emergency room doctor who treated Piskura following the incident, include his observation that "there were 2 puncture wounds over his lower left sternum which were apparently from the Taser

barbs." (Doc. 116, Ex. 7 at 3) (McCullough Hyde Hospital Emergency Department treatment notes).

- Plaintiff Charles Piskura testified that he observed two marks on Piskura's chest less than three inches apart that appeared to be probe penetration marks. (Doc. 94, Ex. 7 at 9) (Deposition of Charles Piskura).[12]

There are genuine, material factual issues on whether the ECD probes made sufficient contact with Piskura to complete an electrical circuit which precludes summary judgment for TASER in this case. TASER suggests its expert opinion evidence is objective, scientific, and unrebutted evidence that is conclusive on the issue of causation. The undersigned disagrees. First, a jury may properly reject an expert witness's opinion "even if uncontradicted." *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 798 (6th Cir. 1996) (finding expert's opinion not binding on jury and jury may reject testimony even if formally uncontradicted). *Cf. Wendorf v. JLG Industries, Inc.,* 683 F. Supp.2d 537, 547 (E.D. Mich. 2010) (where issues of fact exist on adequacy of warnings, expert's opinion to the contrary do not warrant summary judgment for the defendant).

Second, TASER's argument ignores the contrary expert testimony from Dr. Ugwu, the forensic pathologist who concluded that Piskura's death was the result of cardiac arrhythmia

[12] Plaintiffs have proffered unauthenticated diagrams purportedly created by plaintiffs, Mary and Charles Piskura, identifying two marks they observed on Piskura's chest at University Hospital prior to his death. (Doc. 117, Ex. 5). However, these documents are unauthenticated and, consequently, inadmissible and are not properly before the Court. *See Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) (unauthenticated documents do not meet the admissibility requirements of Fed. R. Civ. P. 56(e)). Plaintiffs also proffered an unauthenticated Use of Force report authored by Oxford Police Department Sergeant Colyer which includes his notation that he recovered two taser probes from the emergency room staff and a statement from Oxford Police Officer Ray Sikora, who was working at the emergency room where Piskura was treated after the incident. Officer Sikora purportedly "observed two prong marks in the center of [Piskura's] chest about 5 or 6 inches apart." (Doc. 117, Ex. 4, Use of Force Report). In its reply, TASER asserts that this report and the statement from Officer Sikora are inadmissible hearsay; the undersigned agrees. *See Fox v. Michigan State Police Dept.*, 173 F. App'x 372, 375 (6th Cir. 2006) (unauthenticated police reports are inadmissible); *Miller v. Field*, 35 F.3d 1088 (6th Cir. 1994) (holding that third party statements contained in police reports are inadmissible hearsay). However, as this issue has not been fully briefed and argued by the parties, this determination should not be interpreted as foreclosing the possibility that this evidence may be deemed admissible during trial under some exception to the hearsay rule.

associated with acute alcohol intoxication, recent physical exertion, and application of a conductive electrical device. Dr. Ugwu testified that he "couldn't in good conscious separate [the application of the ECD] from [Piskura's] death. I believe the temporal relationship [between the exposure to the taser and onset of cardiac arrthymia] was too close to be just a coincidence." (Doc. 86, Ex. 2 at 13, Deposition of Dr. Ugwu). While TASER claims that Piskura's death was the result of alcohol intoxication and not exposure to the X26 ECD, this claim is contradicted by Dr. Ugwu's testimony as well as the expert report and testimony of E. Don Nelson, M.D., who opined that the cardiac arrhythmia found in Piskura was atypical from arrhythmias caused by alcohol intoxication. *See* Doc. 91, Ex. 5 and Doc. 93, Ex. 5, Dr. Nelson's Expert Reports; Doc. 90, Ex. 2 at 36, Dr. Nelson's Deposition Testimony.

Third, TASER's conclusory argument that because Dr. Ugwu and Dr. Zipes could not identify a second probe mark on Piskura's body, there was no second probe and, consequently, no electrical charge was delivered to Piskura, ignores circumstantial evidence supporting the opposite conclusion. Notably, Dr. Ugwu and Dr. Zipes were only able to view Piskura's body after his organs had been harvested for donation, and Dr. Zipes testified that the incisions from harvesting could have obliterated the second probe mark. (Doc. 85, Ex. 1, Deposition of Dr. Zipes; Doc. 117, Ex. 2 at 4, Autopsy Report). This circumstantial evidence supports plaintiffs' theory that the "missing" second probe mark was concealed or destroyed by the incision marks from the organ harvesting. In any event, there is evidence of a second probe mark as Charles Piskura testified that he identified two marks on Piskura's chest at University Hospital prior to his death, *see* Doc. 94, Ex. 7 at 9, and Dr. Horn, the emergency room physician, recorded in his treatment notes that he observed "two puncture wounds over [Piskura's] lower left sternum" that at the time he believed were from the taser. (Doc. 117, Ex. 3 at 6-7, Deposition of Stephen Horn,

M.D.). Further, Detective Jones of the Oxford Police Department reported that he "noticed that the taser probes were stuck in [Piskura's] chest area." (Doc. 116, Ex. 6 at 1, Jones' Incident Report). A jury could reasonably determine from this evidence that Piskura was struck with two taser probes.

Lastly, the evidence of record demonstrates that an electrical circuit can be completed and deliver a charge to an individual through layers of clothing, indicating that the absence of a second probe mark is not dispositive as to whether Piskura received an electrical charge from the X26 ECD deployed by Officer Robinson. *See* Doc. 85, Ex. 1 at 12 (Dr. Zipes testified that it was possible that the second taser could have simply been "against the skin" and that an arc was created allowing a complete electrical circuit); Doc. 120, Ex. 5 at 3, 20 (the X26 ECD training manual states that the "X26 transmits powerful electrical pulses along the wires and into the body of the target through up to two inches of clothing[,]" and that "the probes do not have to penetrate the flesh or cause bodily harm to be effective.").

Viewing the evidence in the light most favorable to plaintiffs, there is sufficient testimonial and circumstantial evidence establishing a genuine issue of material fact as to whether the ECD probes from Officer Robinson's taser made contact with Piskura and completed an electrical circuit. The expert opinion evidence proffered by TASER is to be weighed by the trier of fact. *See Dayton Power & Light Co. v. Public Utilities Comm'n*, 292 U.S. 290, 299 (1934) (Cardozo, J.) (Proffered expert opinions "have no such conclusive force that there is error of law in refusing to follow them."). Further, where, as here, "reasonable minds could differ as to . . . proximate cause . . . such determination is better left for the jury." *Merchants Mut. Ins. Co. v. Baker,* 473 N.E.2d 827, 829 (Ohio Ct. App. 1984). Thus, TASER's argument that plaintiffs have failed to establish that the taser used on Piskura completed an

electrical circuit, a fact necessary to establishing the causation element of plaintiffs' OPLA claim, is not well-taken.

b. Genuine issues of material fact remain with respect to whether there were taser probes sufficiently close enough to Piskura's heart to support a finding that the taser induced VF.

TASER next argues that there is no evidence showing a probe sufficiently close to Piskura's heart to show the ECD induced VF. TASER alleges that even if a second taser probe connected with Piskura, plaintiffs present no evidence that a probe was sufficiently close enough to the heart to cause cardiac capture, a precursor to VF. At oral argument, this distance was referred to as the "dart-to-heart" distance. (Doc. 140 at 15). TASER cites to Dr. Zipes' deposition testimony and argues that to induce cardiac capture, the dart-to-heart distance must be less than two centimeters. (Doc. 103 at 15; Doc. 140 at 15).

In support of its argument that the dart-to-heart distance in Piskura's case was too remote to have induced cardiac capture, TASER cites to the testimony of Dr. Zipes, plaintiffs' primary electrophysiology expert, who TASER says does not "dispute" that the dart-to-heart distance in humans must be within 16.7 mm and within 23 mm in pigs (Doc. 137 at 6) and who disagreed with Dr. Ugwu's notation that the purported taser probe mark was "right over the right ventricle." (Doc. 103 at 15, citing Doc. 85, Ex. 1 at 146 [ECF Doc. 85-1 at 44]).[13] However, upon review of Dr. Zipes' deposition testimony, the undersigned believes that TASER has overstated the conclusiveness of this evidence.

First, although Dr. Zipes testified that the maximum dart-to-heart distance for a probe to capture the heart rhythm in a pig is approximately 23 millimeters, or less than one inch, there is

[13] For the sake of clarity, where the parties' citations to exhibits are discussed this opinion will include a dual citation. The first citation represents the parties' citation system and the bracketed citation refers to the

no testimony on the maximum dart-to-heart distance needed to induce cardiac capture in a human heart despite TASER's representation that the "circuit must be within 16.7 mm . . . of Piskura's heart, as admitted by their own expert. . . ." (Doc. 137 at 6, citing Def. Ex. 1 at 174, 203-204 [ECF Doc. 85-1 at 57, 75-76]). The pages of Dr. Zipes' deposition cited by defendants, pages 174, 203, and 204, do not reference dart-to-heart distance in humans. TASER also cites to a May 2012 deposition of Dr. Zipes regarding the dart-to-heart distance (Doc. 137 at 6, citing Def. Ex. 70 at 159-60 [ECF Doc. 135-1]), yet the purportedly relevant portions of the deposition testimony are not included in the exhibit filed with the Court.

Second, with respect to the distance of the probe mark noted by Dr. Ugwu on autopsy, Dr. Zipes testified as follows:

> Q [counsel for TASER]: Now, based upon your knowledge of physiology and cardiology, how far is [the red mark identifying the alleged taser probe contact point] in centimeters from [Piskura's] right ventricle?
>
> A [Dr. Zipes]: I don't know how far, but it's not right over the right ventricle as [Dr. Ugwu] states.
>
> Q: It's actually considerably farther than two centimeter[s] from the right ventricle, correct?
>
> A: Probably.

(Doc. 85, Ex. 1 at 146 [ECF Doc. 85-1 at 44]). Dr. Zipes' testimony that the dart-to-heart distance of the purported probe mark on Piskura's chest was "probably" more than two centimeters[14] is simply too tenuous a statement from which to conclude that no genuine issue remains with respect to whether the taser probes were sufficient close enough to

---

document as it appears in the Court's electronic docketing system.

[14] The Court notes that 23 millimeters equates to 2.3 centimeters. Dr. Zipes' testimony permits an inference that the mark on Piskura's chest was within 2.3 centimeters, which would fall within the range that cardiac capture is found in pigs. Consequently, without further information, it is impossible to conclude that the dart-to-

Piskura's heart to induce cardiac capture.

Third, there is evidence in the record demonstrating that the purported probe mark was "about 2 centimeters," which is within the prescribed distance for inducing cardiac capture as asserted by TASER. (*See* Doc. 117, Ex. 1 at 55, Dr. Ugwu's deposition).[15]

Fourth, the Court cannot say that the evidence "is so one-sided" on the question of dart-to-heart distance that TASER must prevail as a matter of law. *Anderson,* 477 U.S. at 251-52. TASER's argument on dart-to-heart distance is premised solely on the one probe mark visible in the autopsy photographs. At the time of autopsy there was no second probe mark found on Piskura. Thus, there is no second probe mark from which to measure the dart-to-heart distance. Yet, for the reasons discussed above, there is sufficient circumstantial evidence to create a genuine issue of fact on whether a second probe connected with Piskura. The jury could reasonably determine from that the same circumstantial evidence that Piskura's cardiac arrest was caused by the induction of the ECD despite the absence of a second probe mark from which to measure dart-to-heart distance.

In light of the evidence of record, the undersigned finds that a genuine issue of material fact remains with respect to the dart-to-heart distance and that the matter should be put to the jury who will make the final determination after hearing all the evidence and weighing the credibility of the parties' witnesses. Accordingly, TASER's argument that plaintiffs cannot establish that the taser probes were close enough to Piskura's heart to

---

heart distance noted by Dr. Ugwu on autopsy and attested to by Dr. Zipes was not close enough to induce cardiac capture in Piskura.

[15] TASER argues Dr. Ugwu "guessed" at the distance because he admitted he did not measure it. (Doc. 137 at 7, citing Ex. 119 at 127 [ECF Doc. 117-1 at 55]). The Court's review of Dr. Ugwu's testimony indicates he never answered the question "Did you measure it?" and he instead referred to the location of the probe itself. Because the Court has not been provided all of the relevant pages of Dr. Ugwu's deposition containing the full explanation of the dart-to-heart distance (the Court has been provided only page 127 of the deposition in this regard), the Court cannot

induce VF is not well-taken.

c. The Sixth Circuit's holding in *Hirsch* does not prohibit the introduction of scientific expert evidence on the cause of Piskura's death.

For its third causation argument, TASER relies heavily on *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 364 (6th Cir. 2011), where the Sixth Circuit affirmed a grant of summary judgment holding that the plaintiffs' expert witness' opinion—that a "one-in-a-million" chance that the plaintiffs may have increased health risks due to toxins released by a train fire—was insufficient to establish a genuine issue of material fact as to whether or not the effects of the fire required medical monitoring for the plaintiffs. TASER argues that plaintiffs in the present case are similarly unable to establish causation because Dr. Zipes' theory is incalculable and of such legal insignificance as to bar plaintiffs from being able to establish causation under *Hirsch*. In support, TASER cites to Dr. Zipes' testimony in other lawsuits involving ECDs that:

> (1) he has not calculated the probability that an ECD could cause VF in a human and (2) he does not "know how low" the probability is, such that [Dr. Zipes] must concede (3) that the risk of human VF from an ECD is 'incalculable,' despite numerous human studies showing no risk of VF from an ECD.

(Doc. 103 at 21) (citing Dr. Zipes' deposition testimony in *Butler v. TASER Intl., Inc.*, No. CV161436, Superior Court of the State of California for the County of Santa Cruz, Doc. 85, Ex. 2 at 3, 5, 9). For the following reasons, the undersigned finds that the *Hirsch* decision is inapposite under the facts of this case and does not provide a basis for granting TASER's summary judgment motion.

First, *Hirsch* concerns a significantly different factual scenario than that presented in the instant matter. In *Hirsch*, the residents of a small town filed a negligence claim against a train company following a fire that resulted in the release of toxic fumes into the air. *Id.*, 656 F.3d at

conclude at this juncture that Dr. Ugwu's testimony of dart-to-hart distance was a guess.

361. The residents proffered expert opinion evidence showing elevated levels of toxins in the area of their homes and projections about the potential levels to which they would be exposed in the future. The plaintiffs also offered the expert opinion of a medical doctor who stated that certain individuals were likely exposed to levels of toxins above acceptable levels and, consequently, had a one-in-a-million chance of developing an associated illness, and that a reasonable doctor would prescribe medical monitoring for such individuals. *Id*. at 361, 363. The Sixth Circuit determined that given the one-in-a-million chance that the plaintiffs would develop a disease due to their limited exposure to the toxins and the complete lack of any actual damages, the plaintiffs failed to establish the causation element of their negligence claim. *Id*. at 363-64. Notably, the *Hirsch* plaintiffs sought damages for an intangible, future harm. In the instant case, however, plaintiffs have already incurred their injury. Moreover, as noted by the Sixth Circuit, the *Hirsch* plaintiffs' claim might have survived summary judgment had their expert provided some indication of why the remote risk posed by the released toxins required medical monitoring, but instead he offered "little explanation as to why [he] believed that reasonable physicians would order expensive and burdensome testing for a [one-in-a-million] risk . . . except to 'err on the side of safety.'" *Id*. at 363. In contrast, the instant plaintiffs' expert, Dr. Zipes, has provided ample explanation about the process by which cardiac capture occurs following exposure to ECDs to support his opinion that Piskura's death was the result of being tased.

Second, while TASER contends that there are numerous human studies which show no risk of VF from an ECD, Dr. Zipes' recent study contains contrasting findings. As noted *supra*, Dr. Zipes recently published an article analyzing the findings from eight cases where cardiac arrest and/or death occurred following ECD exposure. *See Sudden Cardiac Arrest and Death*

*Associated with Application of Shocks from a TASER Electronic Control Device*, 125 Circulation 2417-422 (2012). In his article, Dr. Zipes concludes that ECD stimulation can cause cardiac capture and lead to VF in humans. *Id*. Given these findings, as well as those contained within the numerous animal studies contained in the record, Dr. Zipes' inability to put forth a specific rate of occurrence of cardiac capture in humans exposed to ECDs does not mandate summary judgment for TASER.

Third, to the extent that TASER asserts that Piskura's death was the result of alcohol intoxication and not taser exposure as plaintiffs assert, their argument simply highlights the factual issue in this case – the cause of Piskura's death. Certainly, TASER is free to introduce at trial evidence of Piskura's intoxication, including an expert opinion that his death resulted from alcohol toxicity and not ECD exposure – evidence that will certainly be rebutted by plaintiffs' expert testimony to the contrary. Such a factual dispute is precisely why summary judgment is inappropriate in this case.

Following the completion of the briefing and oral argument, TASER filed a motion to submit additional authority (Doc. 145) in support of this argument. The motion directs the Court to recent Sixth and Ninth Circuit opinions: *Hagans v. Franklin County Sheriff's Office*, __ F.3d __, 2012 WL 3608510 (6th Cir. 2012) and *Marquez v. City of Phoenix*, __ F.3d __, 2012 WL 3937717 (9th Cir. 2012). Plaintiffs oppose the late-submitted authority, challenging the relevance of the cases to the instant facts. The undersigned grants TASER's motion to submit this additional authority as plaintiffs have not demonstrated any prejudice and have had ample opportunity to address these cases in their memoranda. Further, the undersigned finds that the *Hagans* and *Marquez* decisions are inapposite and do not require a different resolution on the causation issue from that enunciated above.

In *Hagans*, the Sixth Circuit reversed the district court's denial of summary judgment on the plaintiff's Fourth Amendment claim of excessive force on the ground that the defendant police officer was entitled to qualified immunity. *Hagans*, 2012 WL 3608510, at *1. Similar to the instant matter, the suit was brought on behalf of an individual who died several days after being tased by an X26 ECD; yet, this is where the similarities end. *Id*. Unlike Piskura, the decedent in *Hagans* was not subject to a probe shock to the chest but, rather, to multiple drive stuns to his back and other body areas. *Id*. Further, the *Hagans* decedent's cause of death was listed as "bronchopneumonia due to anoxic encephalopathy due to cocaine intoxication," *id*. at *2, while Piskura's death was attributed to: "(A) [a]noxic encephalopathy and multiple organ failure due to sudden cardiac arrhythmia[;] (B) [a]ssociated with acute alcohol intoxication, recent physical exertion[; and] (C) *[r]ecent history of application of conductive electrical device*." (Doc. 93, Ex. 7, Death Record from Hamilton County Coroner's Office) (emphasis added). These distinctions, taken alone, are reason enough for not applying the rationale of *Hagans* to the instant case. Moreover, as noted by plaintiffs, the issues presented in *Hagans* involved claims of excessive force and whether a police officer was entitled to qualified immunity. Thus, the *Hagans* court did not address the sufficiency of warnings issued by TASER with respect to using an X26 ECD on a suspect's chest.

In its motion to supplement, TASER cites to the following language from *Hagans*, which TASER asserts establishes that the ECD used on Piskura is a low risk alternative to using physical force:

> The taser remains a relatively new technology, and courts and law enforcement agencies still grapple with the risks and benefits of the device. Even as of a year ago, however, it could be said that tasers carry a significantly lower risk of injury than physical force and that the vast majority of individuals subjected to a taser – 99.7% - suffer no injury or only a mild injury.

*Hagans*, 2012 WL 3608510, at *4 (internal citations omitted). This language is dicta used by the *Hagans* court to support its holding that the defendant officer's use of a taser under the circumstances of that case was reasonable as a matter of constitutional law and did not violate clearly established law. It was not a finding of law on the safety of ECDs. Accordingly, the *Hagans* decision does not mandate a grant of summary judgment as TASER suggests.

Similarly, the facts of the *Marquez* case are sufficiently unique, such that applying its rationale to the instant matter would require this Court to ignore the evidence supporting plaintiffs' claims in this case. *Marquez* involved the use of a taser in probe mode on an individual's lower left chest and in drive stun mode[16] elsewhere for a combined 22 times on an obese, mentally ill, and intoxicated individual with a heart condition. Unlike the instant case, exposure to an ECD was not listed among the causes of the decedent's death in *Marquez*. 2012 WL 3937717, at *2. The question before the *Marquez* court was whether TASER provided sufficient warning that the repeated use of an ECD may lead to death. 2012 WL 3937717, at *1, *3. In contrast, the claim in the instant case is directed at TASER's failure to warn about the cardiac risks associated with deploying ECDs in the chest area near the heart. In light of these factual dissimilarities, the *Marquez* case is distinguishable.

Further, the *Marquez* court's rationale is not applicable in the instant matter. In *Marquez*, the Ninth Circuit affirmed the district court's grant of summary judgment and held that TASER's warnings were sufficient as a matter of law as the warning encompassed the specific circumstances of that case, namely the exposure to repeated and prolonged ECD applications.

[16] "'Drive-stun mode' does not incapacitate the target, but instead encourages the suspect to comply by causing pain" by placing the weapon's exposed electrodes in direct contact with the skin. *Marquez*, 2012 WL 3937717, at *2.

*Id*. at *3-*4. In the present case, the issue involves the sufficiency of TASER's warnings with respect to targeting a suspect's chest with an ECD, which were nonexistent at the time Officer Robinson tased Piskura; hence, the *Marquez* holding is inapposite. Notably, the *Marquez* language cited by TASER involves a fact unique to that case which is not at play here. The decedent in *Marquez* suffered from heart disease and the plaintiffs asserted that TASER had a duty to provide specific warnings that such people would have increased susceptibility to the effects of ECDs that could result in death. *Id*. at *2, 4. The Ninth Circuit, as quoted by TASER in its motion to supplement, stated:

> When a case involves idiosyncratic reactions – usually an allergy but in this case an unusual reaction to the application of an electronic control device – a warning is required only 'when the harm-causing [aspect of the product] is one to which a substantial number of people' would be subject.
>
> TASER could have provided a stronger warning that specifically addressed risks faced by vulnerable populations . . . [but] the [plaintiffs] have neither shown that a 'substantial number' of people were affected by the alleged idiosyncratic reaction nor explained what language they would have preferred. Thus, we agree with the district court that such a warning was sufficient as a matter of law.

*Id*. at *4 (quoting Restatement (Third) of Torts: Products Liability § 2 cmts. i and k) (internal citations omitted). Here, there is no claim that Piskura was particularly susceptible to being tased; rather, plaintiffs contend that the X26 ECD is inherently dangerous as it may result in cardiac capture when used near a person's heart and that TASER failed to adequately warn about this risk at the time Piskura was tased despite having prior knowledge of the risk. Accordingly, the undersigned finds that the *Marquez* decision does not foreclose the instant plaintiffs' claims.

TASER's third argument in support of a finding that plaintiffs have failed to establish causation is not well-taken.

d. Plaintiffs have presented admissible expert opinion evidence in support of their case-in-chief.

For their final causation argument, TASER asserts that plaintiffs have failed to provide any expert evidence establishing the causation element of their claim. This argument is premised on the assumption that TASER's motion to exclude Dr. Zipes' testimony would be granted. As detailed above, however, the undersigned has recommended that the motion be denied. Consequently, TASER's argument that plaintiffs cannot establish causation for lack of expert opinion evidence is not well-taken.

2) *The Ohio Product Liability Act and Plaintiffs' Negligence Claims*

For their second argument, TASER contends that summary judgment should be granted in its favor on plaintiffs' state law negligence and wrongful death claims, *see* Doc. 1, Counts III-IV,[17] as these claims are preempted by the OPLA, Ohio Rev. Code §§ 2307.71-2307.80, by virtue of plaintiffs raising a products liability claim. *See* Doc. 1, ¶¶ 32-44, Count II. TASER argues that when the OPLA was enacted in 2005, it abrogated all common law claims relating to product liability claims and, consequently, plaintiffs' remaining state law claims must be dismissed as a matter of law. Further, TASER asserts that plaintiffs' survivorship claim, Count VI, must be dismissed as it is derivative of the abrogated state law claims and similarly preempted.

Plaintiffs argue, in opposition, that the OPLA only abrogates common law claims based on strict liability and not negligence. Further, plaintiffs assert that claims seeking compensatory damages for economic loss are not subject to, nor preempted by, the OPLA. Thus, plaintiffs contend that their products-liability claim, Count III, and their misrepresentation claim, Count V,

---

[17] Though TASER further argues for the dismissal of Count V, this Count is only asserted against the

which are grounded in negligence, are not abrogated by the OPLA. With respect to their survivorship claim, plaintiffs concede that it is a derivative claim, but assert that it should not be dismissed as their common law negligence claims survive under the OPLA.

The Ohio legislature codified strict liability claims through the enactment of the OPLA in 1988. The OPLA has been twice amended, once in 2005 and again in 2007; these amendments specify that the legislature's intent in enacting the OPLA was "to abrogate *all* common law product liability causes of action." *Wimbush v. Wyeth*, 619 F.3d 632, 637 (6th Cir. 2010) (emphasis in original). *See also* Ohio Rev. Code § 2307.71 (West 2007) ("Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action."). The OPLA applies to recovery of compensatory, punitive, and exemplary damages based on product liability claims. Ohio Rev. Code § 2307.72(A)-(B) (West 2007). However, "recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, *other than a product liability claim*" is not preempted by the OPLA. Ohio Rev. Code § 2307.72(C) (West 2007).

> A "[p]roduct liability claim" means a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:
>
> (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
>
> (b) Any warning or instruction, or lack of warning or instruction, associated with that product;

Ohio Rev. Code § 2307.71(A)(13)(a)-(b) (West 2007).

---

previously dismissed Oxford Defendants and TASER has no standing to seek dismissal of this count.

Here, Counts III and IV of plaintiffs' complaint assert non-statutory product liability claims against TASER. Count III, plaintiffs' claim of wrongful death, common law negligence and product liability, seeks recovery of compensatory and punitive damages for TASER's alleged failures to adequately warn of the dangers of ECDs and to exercise reasonable care in designing, manufacturing, selling, distributing, installing, fabricating, assembling, inspecting, testing, marketing, warranting, and advertising their ECDs. *See* Doc. 1, ¶¶ 45-55. This is precisely the sort of common law negligence claim the Ohio legislature intended the OPLA to abrogate. *See* Ohio Rev. Code § 2307.71(A)(13)(a)-(b), (B). *See also Evans v. Hanger Prosthetics & Orthotics, Inc.*, 735 F. Supp.2d 785, 796 (N.D. Ohio 2010) (holding that common law claims of failure to warn and negligent design, manufacture, and implementation were abrogated by the OPLA). Further supporting a finding that plaintiffs' negligence product liability claim (Count III) is abrogated is "commentary contained in 2004 S.B. 80, [in which] the [Ohio] General Assembly stated in regard to § 2307.71(B) that it was 'intended to supersede the holding of the Ohio Supreme Court in *Carrel v. Allied Prods. Corp.* (1997), 677 N.E.2d 795, that the common-law product liability cause of action of negligent design survives the enactment of the [OPLA] and to abrogate all common law product liability causes of action.'" *Thompson v. Sunbeam Prods.*, No. 2:10-cv-98, 2011 WL 4502049, at *15 (S.D. Ohio Sept. 28, 2011). Given the plain language of the statute and prior courts' interpretation thereof, TASER's contention that plaintiffs' common law negligence claims are abrogated by the OPLA is persuasive.

Plaintiffs, relying on *Boyd v. Lincoln Elec. Co.*, 902 N.E.2d 1023 (Ohio Ct. App. 2008), contend that "common-law products-liability actions grounded in negligence," such as Count III, are not displaced by the OPLA. In *Boyd*, decided after the 2005 amendments to the OPLA, the Ohio Court of Appeals held that the OPLA did not abrogate common law product liability

claims. *Id*. at 1028. Yet, as noted by TASER, this holding was based on the Ohio Supreme Court's holding in the *Carrel* case[18] which, as stated above, the Ohio legislature expressly superseded by enacting § 2307.71(B) of the OPLA. Further, the case is factually distinguishable as the claims raised by the *Boyd* plaintiff involved injuries that accrued during his employment as a welder, between 1977 and 2004, and the lawsuit was filed in 2004, prior to the 2005 amendments. *Id*. at 1025-26. Products-liability claims grounded in negligence that accrued prior to the 2005 amendments are not abrogated by the OPLA. *See Doty v. Fellhauer Elec., Inc*., 888 N.E.2d 1138, 1142 (Ohio Ct. App. 2008); *Deacon v. Apotex, Corp.*, No. 3:07-cv-322, 2008 WL 2844652, at *4 (S.D. Ohio July 22, 2008). Here, however, plaintiffs' negligence-based product liability claim, Count III, relates to incidents occurring after the 2005 amendments to the OPLA were effective and, consequently, is preempted.

Turning to plaintiffs' Count IV, the claim for wrongful death/intentional and negligent concealment and misrepresentation is likewise abrogated. Plaintiffs' Count IV alleges that TASER misrepresented and failed to disclose and or failed to warn the Oxford Police Department of the potential dangers associated with utilizing ECDs, such as their lethality and capacity for causing cardiac arrest and VF. The OPLA definition for "product liability claim" includes "[a]ny warning or instruction, or lack of warning or instruction associated with" the product at issue as well as representations of material facts concerning the product. Ohio Rev. Code §§ 2307.71(A)(13)(b), (14). Here, plaintiffs' Count IV is squarely directed at TASER's alleged failure to provide appropriate warnings with respect to their ECDs, and such claims fall

[18] In holding that common-law products-liability claims grounded in negligence were not preempted by the OPLA, the *Boyd* court also relied on *Crislip v. TCH Liquidating Co.*, 556 N.E.2d 1177 (1990). However, like *Carrel*, *Crislip* was decided prior to the enactment of the 2005 amendments and before the Ohio legislature expressed its unambiguous intent that such negligence claims be abrogated by the OPLA. Accordingly, the *Crislip*

within the domain of the OPLA. *See Delahunt v. Cytodyne Techs*., 241 F. Supp.2d 827, 842-43 (S.D. Ohio 2003) (dismissing plaintiff's common law claim for inadequate warning and holding that such claims are to be raised under the OPLA). Plaintiffs argue that Count IV is not abrogated by the OPLA, citing to *CCB Ohio LLC v. Chemque, Inc.*, 649 F. Supp.2d 757, 763-64 (S.D. Ohio 2009), a case where the court held that a claim of negligent misrepresentation was "outside the scope of the OPLA's abrogation, as [it] did not fit neatly into" the OPLA's definition of a common law product liability claim. The undersigned finds that the *Chemque* rationale, which appears to be informed by the particular facts of that case, does not apply here.[19] Further, the Court is persuaded by the rationale of the cases cited by TASER which supports a finding that plaintiffs' Count IV is abrogated by the OPLA. *See Thompson v. Sunbeam Prods*., No. 2:10-cv-98, 2011 WL 4502049, at *15 (S.D. Ohio Sept. 28 2011) (claims of misrepresentation regarding warnings of products are abrogated by § 2307.76 of the OPLA); *Deacon*, 2008 WL 2844652, at *4 (same); *Miller v. Alza Corp.*, 759 F. Supp.2d 929, 943-44 (S.D. Ohio 2010) (common law negligent misrepresentation claims not specifically raised under the Uniform Commercial Code are abrogated by the OPLA). Consequently, the undersigned recommends that plaintiffs' Count IV be dismissed.

Lastly, plaintiffs' survivorship count, Count VI, should not be dismissed. "Survivorship is a claim that is derivative of the principal claims in a complaint." *Stratford v. SmithKline*

---

holding is inapposite.

[19] Notably, the court in *Chemque* distinguished the holding of *Deacon*, 2008 WL 2844652, at *4, that the OPLA abrogated the wrongful death failure to warn claim, as that claim, unlike the claim in *Chemque*, was a common law claim. Though not explicitly stated, it appears that the *Chemque* holding was premised on the plaintiffs' representations that its claims were grounded in the Uniform Commercial Code and, thus, not abrogated by the OPLA. *Chemque*, 649 F. Supp.2d at 763. *See also Miles v. Raymond Corp.*, 612 F. Supp.2d 913, 922-25 (N.D. Ohio 2009) (claims based in the Uniform Commercial Code are separately cognizable under Ohio contract law and are not preempted by the OPLA). Here, there is no such assertion by plaintiffs that Count IV is not grounded in Ohio common law.

*Beecham Corp.*, No. 2:07-cv-639, 2008 WL 2491965, at *9 (S.D. Ohio June 17, 2008). "The claim for survivorship in [a] complaint remains so long as any of the underlying principal claims in the complaint remain." *Id*. Here, the undersigned has recommended that TASER's motion for summary judgment be denied in part and granted in part based on the finding that plaintiffs' OPLA claim should survive. Consequently, as this principal claim remains so should plaintiffs' claim for survivorship.

3) *Summary Judgment Should Not Be Granted on Plaintiffs' Punitive Damages Claim.*

Alternatively, TASER argues that plaintiffs' punitive damages claims, raised in Counts II, III, IV, and VI, must be dismissed under Ohio law as TASER's actions do not "demonstrate malice or aggravated or egregious fraud." Ohio Rev. Code § 2315.21(C)(1). In support, TASER notes a myriad of scientific findings supporting the safety of the use of ECDs, the extensive warnings issued in conjunction with their ECD products, and their ongoing efforts to provide continuous updates in these areas. TASER further cites to the widespread use of ECDs by law enforcement agencies, both in the United States and internationally, and studies underscoring the reduction of injuries to both law enforcement employees and suspects through the use of ECDs. *See* Doc. 92, Ex. 3, ¶¶ 33-34, Affidavit of Patrick W. Smith, CEO of Taser. TASER identifies that their training materials contain explicit and extensive warnings, including that the use of an ECD runs a risk of death due to "physical exertion, unforeseen circumstances and individual susceptibilities." (Doc. 88, Ex. 3 at 2). In light of this evidence, TASER asserts that there is no record evidence which could support a jury finding that they have acted with malice or fraud and, consequently, summary judgment is warranted with respect to plaintiff's punitive damages claims.

In response, plaintiffs claim that there is evidence of record from which a jury could adduce that recovery of punitive damages is proper in light of TASER's knowledge of the danger of using ECD devices on the chest area. In support, plaintiffs identify the following testimony of Max Nerhaim, the engineer who designed the ECD used on Piskura, as evidence that TASER had prior knowledge of the risks associated with ECD use on the chest area.

> Q. Well, do you think that the device would even be safer if it was not shot into the chest but was shot into areas further from the heart, where feasible?
>
> A. I do think so.
>
> Q. And that it would be safer if it was not shot in the chest. Correct?
>
> A. If it was shot in such a manner that a current would not flow across the heart.
>
> Q. That would make it even safer, when we talk about –
>
> A. Yeah, that would make 100 percent safe, a hundred point zero zero zero zero percent safe.

*See* Doc. 114, Ex. 1 at 14. Plaintiffs also point to evidence that: (1) the TASER executive in charge of training, Rick Guilbault, was not told about studies which found cardiac capture could occur and, consequently, was unable to incorporate those results into training materials (Doc. 118, Ex. 3 at 6-7); (2) the TASER executive in charge of sales, Tom Smith, was not told about Dr. Nanthakumar's independent study which demonstrated that the ECD model used on Piskura significantly increased the risk of cardiac capture (Doc. 119, Ex. 3 at 6); (3) the TASER executive in charge of communications, Steve Tuttle, was not told about TASER-funded researchers' warnings to not shoot ECD darts into suspects chests (Doc. 119, Ex. 4 at 4-5); and (4) TASER's consultant, Charles M. Swerdlow, M.D., an electrophysiologist, warned TASER that they should act on the results of animal studies which demonstrated cardiac capture and cardiac arrest due to ECD exposure. (Doc. 119, Ex. 5 at 3-4). Plaintiffs contend that this

evidence demonstrates that TASER acted with a conscious disregard for known safety defects and inherent risks in the design of the ECD used against Piskura and, hence, is sufficient to put their punitive damages claims before a jury.

Pursuant to the OPLA:

> [P]unitive or exemplary damages shall not be awarded against a manufacturer or supplier in question in connection with a product liability claim unless the claimant establishes by clear and convincing evidence, that harm for which the claimant is entitled to recover compensatory damages . . . was the result of misconduct of the manufacturer or supplier in question that manifested a flagrant disregard of the safety of persons who might be harmed by the product in question. The fact by itself that a product is defective does not establish a flagrant disregard of the safety of persons who might be harmed by that product.

Ohio Rev. Code § 2307.80(A).[20]

The testimony and evidence cited by the parties demonstrates that there are facts in dispute with regard to whether TASER engaged in misconduct that amounted to a "flagrant disregard" of the safety of individuals likely to be tased in issuing its warnings regarding the dangers of the X26 ECD. TASER has put forth evidence that their ECDs are widely used by law enforcement internationally and are accompanied by warnings that ECD exposure may lead to death in certain cases. Conversely, plaintiffs have proffered evidence indicating that TASER failed to properly account for and/or warn end users of the risks associated with targeting ECD units at suspects' chests despite its knowledge of evidence that ECD use can induce cardiac capture and cardiac arrest. Moreover, in light of this Court's findings that there remain genuine issues of material fact with respect to plaintiffs' OPLA claim, it is improper to dispose of

[20] TASER cites to Ohio Rev. Code § 2315.21 as the statute governing awards of punitive damages in its initial brief, *see* Doc. 103 at 23; however, this statute has been recognized as unconstitutional. *See Hill v. Steel Ceilings, Inc.*, No. 11-CA-38, 2011 WL 58443497, at *2 (Ohio Ct. App. Nov. 18, 2011). In its reply, TASER appears to concede that Ohio Rev. Code § 2307.80 is, in fact, the statute governing punitive damages awards. *See* Doc. 137 at 24.

plaintiffs' punitive damages claim at this juncture. *See Hertzfeld v. Hayward Pool Prods., Inc.*, No. L-07-1168, 2007 WL 4563446, at *10 (Ohio Ct. App. Dec. 31, 2007) ("Because [punitive damages are] only determined if and after a plaintiff has proven liability, the question of whether the issue of punitive damages reaches a jury is not properly disposed of where a genuine issue of material fact exists at the summary judgment stage.").

Accordingly, the undersigned recommends that TASER's motion for summary judgment on plaintiffs' punitive damages claims be denied.

4) *Summary Judgment Should Be Granted on Any Design or Manufacture Defect Claims*.

Lastly, TASER argues that summary judgment should be granted on any design, manufacture, or misrepresentation claim made by plaintiffs due to a lack of evidence. TASER contends that plaintiffs have presented no evidence of a manufacturing defect, an alternative design, or any other evidence supporting a manufacture or design defect claim as required under Ohio Rev. Code §§ 2307.74, 2307.75, 2307.76. Without such evidence, TASER asserts that any defect claim raised by plaintiffs must be dismissed as a matter of law.

Plaintiffs' brief in opposition is silent on this issue. Further, at oral argument, counsel for plaintiffs represented that plaintiffs "don't claim and have never claimed that the [ECD] in and of itself was manufactured defectively [or] that it had a design defect.[21] . . . But if your question specifically is do we believe that it was manufactured improperly, we have not made that claim, and we have no evidence to make that claim." Doc. 140 at 53, lns. 15-17, 23-25). In light of plaintiffs' representations, their failure to respond to TASER's motion for summary judgment on

[21] A review of plaintiffs' complaint reveals that plaintiffs have, in fact, alleged claims of defective manufacture and design and/or formulation under Ohio Rev. Code §§ 2307.74 and 2307.75. *See* Doc. 1, ¶¶ 35-36.

this issue,[22] and the dearth of evidence of a manufacture, design, or formulation defect, the undersigned finds that TASER is entitled to summary judgment to the extent that plaintiffs seek to raise a defect claim under Ohio Rev. Code §§ 2307.74 and 2307.75.

## V. Conclusion

For these reasons, the Court hereby **RECOMMENDS** that TASER's motion for summary judgment (Doc. 84) be **GRANTED** in part and **DENIED** in part. Specifically, TASER's motion for summary judgment should be **GRANTED** with respect to plaintiffs' Counts III and IV and **DENIED** with respect to plaintiffs' Counts II and VI.

Further, the Court **ORDERS** that TASER's motion *in limine* to exclude Dr. Zipes' testimony (Doc. 105) is **DENIED** for the reasons stated herein. The Court **ORDERS** that TASER's objection to plaintiffs' filing of the highlighted proposed statement of facts (Doc. 143) is **OVERRULED** and that TASER's motion to submit supplemental authority (Doc. 145) is **GRANTED**.

Date: 10/29/2012

s/Karen L. Litkovitz
Karen L. Litkovitz
United States Magistrate Judge

[22] Plaintiffs' complete avoidance of this issue in their response to TASER's summary judgment motion amounts to a waiver. *See Campbell v. McMinn County, Tenn.*, No. 1:10-cv-278, 2012 WL 369090, at *7 (E.D. Tenn. Feb. 3, 2012) (where party fails to respond to arguments raised in summary judgment motion, they have "effectively waived any objection.").

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| MARY PISKURA, *et al.*,<br>Plaintiffs, | Case No. 1:10-cv-248 |
| v. | Weber, J.<br>Litkovitz, M.J. |
| TASER INTERNATIONAL, *et al.*,<br>Defendants. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).