UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARY PISKURA, et al,

        Plaintiffs

      v.                           Case No. 1:10-cv-248-HJW

TASER INTERNATIONAL, INC., et al,

        Defendants

## ORDER

    Pending are four motions in limine (doc. nos. 95, 97, 98, 101) by defendant Taser International Inc. ("TASER"). Plaintiffs oppose the motions. On June 11, 2013, the Court held a hearing at which counsel presented oral arguments. Although the Court expected witnesses to testify, respective counsel chose to proceed on the written record. Having considered the record, including the parties' briefs and related filings,[1] exhibits, oral arguments, and applicable authority, the Court will limit some, but not all, of the anticipated testimony for the following reasons:

## I. Introduction

    The plaintiffs' main pending claim is that TASER allegedly failed to adequately warn police about the cardiac risks of TASER X26 shots to a person's chest. TASER defends on the basis that its warnings were adequate in light of available scientific and medical information, and that in any case, any alleged

---

[1] **This includes TASER's "Notice of Errata" (doc. no. 179) concerning corrections to various briefs (docket nos. 110, 102, 132, and 133).**

failure to warn was not the cause of Kevin Piskura's death. TASER contends that Kevin Piskura died of acute alcohol intoxication, rather than the effects of the TASER X26 device.[2] At trial, plaintiffs intend to introduce testimony, some of which is "expert" opinion testimony. In four motions, TASER challenges the admission of certain anticipated testimony of six witnesses. The motions have been fully briefed and are ripe for consideration.

## II. Relevant Law

Rule 104(a) provides in relevant part that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Fed.R.Evid. 104(a).

Rule 702 of the Federal Rule of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to . . . determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

---

2 The TASER X26 is an electronic control device ("ECD") that may be used in two different ways: dart-mode or drive-stun mode. In dart-mode the device "uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge ... The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." Mattos v. Agarano, 661 F.3d 433, 443 (9th Cir. 2011) , cert. denied, 132 S.Ct. 2681 (2012) (quoting Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010) (en banc)). "When a taser is used in drive-stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." Id.

> the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. District courts have a "gatekeeping role" in screening the use of expert testimony, and trial judges have discretion to determine whether such testimony is admissible, based on whether it is both relevant and reliable. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-97 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999). Courts have "broad latitude" in making this determination. Kumho, 526 U.S. at 138. The inquiry is "a flexible one," and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 594–95.

Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. "[T]he gatekeeping inquiry must be tied to the facts of a particular case, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho, 526 U.S. at 147–148. The basic standard of relevance under the Federal Rules of Evidence is a liberal one, Daubert, 509 U.S. at 588, and "the rejection of expert testimony is the exception rather than the rule," Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments.

The burden of laying the proper foundation for the admission of expert testimony rests with the party offering the expert. Daubert, 509 U.S. at 592, fn.10 (citing Bourjaily v. U.S., 483 U.S. 171 (1987)); see also, Maggard v. Ford Motor Co.,

320 Fed.Appx. 367, 378 (6th Cir.), cert. denied, 558 U.S. 1049 (2009); Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments (observing that the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence).

II. Discussion

A. the Motion to Exclude Certain Opinions from Dr. Horn and Mr. and Mrs. Piskura (doc. no. 95)

In its motion, TASER characterizes certain anticipated testimony as "expert" opinion testimony and moves to exclude it as "late and unreliable." Specifically, TASER contends that although these three witnesses have all indicated that they observed two puncture wounds on Kevin Piskura's chest, they must be qualified as "experts" in order to testify that these were "TASER probe marks." TASER contends that they "are not qualified to answer specific questions concerning . . . the presence of alleged ECD probe signature marks on Kevin Piskura" (doc. no. 95 at 1).[3] TASER argues that the plaintiffs have not met their Rule 702 burden to establish the admissibility of these "expert" opinions and "did not timely disclose these witnesses as testifying experts" (Id. at 2).

Although TASER's motion seeks to exclude the testimony of Dr. Steven

_____

[3] Although TASER premises its argument on the assertion that these witnesses must be "experts" in forensic pathology or electrophysiology to testify that the puncture wounds were "TASER probe marks," it offers no explanation for such assertion. TASER has not explained why a person who had observed two puncture wounds on Piskura's chest and knew that Piskura had just been "tased" in the chest could not draw a reasonable inference that such wounds were "from the TASER barbs." It is unclear from TASER's brief why this would be "expert" testimony.

Horn, M.D., on the basis of "untimely identification," TASER conceded at the hearing that the plaintiffs *did* timely designate Dr. Horn as a non-retained expert witness. Dr. Horn is the emergency room physician who treated Kevin Piskura at McCullough-Hyde Hospital in Oxford, Ohio. He testified at deposition that when Piskura arrived at the hospital, he was unresponsive with a "flat line rhythm" on the monitor, despite ongoing efforts to rescusitate him (doc. no. 92-6 at 7, Horn Dep. at 10). Piskura was placed on an external pacemaker and given other emergency treatment, but despite all efforts to save him, he died several days later. Plaintiffs indicate they intend to elicit Dr. Horn's trial testimony that during his examination and treatment of Piskura, he observed "two puncture wounds over the left sternum" of Piskura's chest. Dr. Horn indicated at deposition that he was aware that a TASER device had been used on Piskura and that he believed the two puncture wounds were "from the TASER barbs" (doc. no. 92-6 at 7, 9-10, Horn Dep. at 10, 23, 74). He indicated he had previously seen patients with TASER wounds and had read some peer-reviewed literature about such wounds and their treatment, but indicated at deposition that he does not consider himself an "expert" on them (Id. at 10-12, Horn Dep. at 74-76).

On this basis, TASER seeks to exclude Dr. Horn's anticipated testimony that the two puncture wounds were from the "TASER barbs." Although Dr. Horn indicated at deposition that he did not consider himself an "expert" on TASER probe marks, such self-assessment is not controlling. The Sixth Circuit Court of Appeals has explained that "[w]hile a witness's self-assessment may be relevant, ultimately the district court—and not the individuals testifying—must determine

whether the proposed testimony is sufficiently reliable and relevant to be admitted." Thomas v. Novartis Pharm. Corp., 443 Fed.Appx. 58, 62 (6th Cir. (Tenn.) 2011) (observing that "it would not benefit the legal system to exclude qualified individuals who modestly state that they do not believe themselves to be experts in favor of more savvy individuals who make their livings providing expert testimony"); see also, e.g., Harvey v. Novartis Pharm. Corp., 895 F.Supp.2d 1206, 1211 (N.D.Ala. 2012) ("Just as an individual cannot simply declare himself to be an expert, a person cannot simply declare himself *not* to be an expert.") (italic added). Regardless of the comment elicited from the witness at deposition by TASER's counsel, it is the Court's role to consider whether any proposed expert testimony meets the requirements of Rule 702.

Plaintiffs emphasize that Dr. Horn testified he had previously seen patients with puncture wounds from a TASER device and that Piskura's wounds were consistent with his medical experience as an emergency room physician (doc. no. 128 at 4-5). Dr. Horn also indicated he had read peer-reviewed literature about treating wounds from TASER barbs (Horn Dep. at 74-76). TASER, other than its own assertion, does not give any reason why an emergency room physician with this experience and knowledge could not attribute the two puncture wounds on Piskura's chest "to the TASER barbs."

Plaintiffs argue that the "testimony of Dr. Horn and Piskura's parents regarding the wounds they observed on Piskura's chest is highly relevant in proving a critical fact in the case – that the ECD probes struck him in the chest and, as a consequence, [he] was subjected to an ECD discharge" (doc. no. 128 at

4). TASER contends that the presence of probe marks "does not equate to or confirm a delivery of electrical charge" (doc. no. 96 at 3). In any event, plaintiffs indicate that Dr. Horn will *not* be asked whether electricity flowed through the ECD probes, nor for any expert opinion as to the cause of death. Rather, Dr. Horn "will simply testify that he observed two probe wounds in the chest of Piskura and that they were consistent with other TASER wounds he had observed on other patients in the past" (doc. no. 128 at 4-5). TASER concedes that Dr. Horn may testify to his personal observations of the two puncture wounds. The Court agrees that Dr. Horn may so testify. Based on Dr. Horn's education and training as an emergency room physician, and given his familiarity and past experience with other patients with wounds from TASER devices, Dr. Horn may testify that he believed the two puncture wounds he observed on Piskura's chest were "from the TASER barbs."

Charles and Mary Piskura have also indicated that they observed two puncture wounds on their son's chest while he was at the hospital. Plaintiffs point out that "Mary and Charles Piskura are both retired police officers" with "specialized training in crime scene investigations" and that Charles Piskura "received TASER ECD training and is generally aware of the wounds caused by an ECD probe deployment" (doc. no. 128 at 5). Nonetheless, plaintiffs indicated in their brief (and at the hearing), that they will *not* "offer an opinion [at trial] about whether these wounds are actually TASER probe wounds" (Id. at 6). At the hearing, plaintiffs' counsel asserted, and TASER conceded, that Mr. and Mrs. Piskura may testify as "fact witnesses" to the two puncture wounds they personally observed on Kevin Piskura's chest at the hospital prior to his death and

any "organ harvesting." The Court agrees that the witnesses may testify to their personal observations. This testimony is not "expert" testimony.[4]

TASER's argument that the Court should not allow such witnesses to testify about their own personal observations because "the video and still frame evidence belie layperson statements" (doc. no. 134 at 5) provides no basis to exclude such testimony. See Jackim v. Sam's East, Inc., 378 Fed.Appx. 556, 566 (6th Cir. (Ohio) 2010), cert. denied, 131 S.Ct. 477 (2010) ("the fact that a video recording may at times be . . . the 'best' evidence of what occurred does not render first-hand testimony of the event incompetent") (citing O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d 567, 598–99 (6th Cir. 2009)); see also, 31 Fed. Prac. & Proc. Evid. § 7184 (explaining that "a witness to an event or condition may testify as to what he saw even though a photograph of the event or condition exists").

Although TASER insists in its brief that several enhanced photographs from its 11-second videotape "clearly" show TASER's version of events (i.e. that Piskura was struck by only one probe because only one probe is visible in the still frame photographs), the copies in the record are so blurry and poor in quality that very little can be discerned from them (doc. no. 96 at 4-5). See Fontenot v. TASER Int'l, Inc., 2011 WL 2535016, *1 fn. 3 (W.D.N.C.) (observing that "although the video provides an overall impression of the incident, its poor quality and lack of audio mean that it does not completely resolve what occurred"). Contrary to TASER's assertion that its video evidence "cannot be contradicted" (doc. no. 96 at 6), it is

---

4 Although TASER argues that Mr. and Mrs. Piskura were not timely identified as "experts," they are not offering any "expert testimony.

the jury's role to weigh any conflicting evidence. See, e.g., <u>Snyder v. Tiller</u>, 2010 WL 3522580, *4 (N.D. Ind.) (observing that the events shown on a videotape were "open to interpretation" by the finder of fact).

TASER argues one additional point. At deposition, Charles and Mary Piskura each provided an outline drawing of their son's body indicating the location of the two puncture wounds they had observed. At the hearing, their counsel explained that such drawings were provided as a courtesy to TASER. Plaintiffs' counsel asserted that TASER's objection to the purported "untimeliness" of such drawings is without merit because the drawings were merely provided at deposition to help illustrate and clarify the Piskuras' testimony. Insofar as TASER moves to exclude the drawings as "evidence," TASER's motion is sustained. Witnesses may, however, while testifying at trial, provide illustrations to clarify their testimony. See <u>O'Brien</u>, 575 F.3d at 601 n.12 (explaining that trial courts have discretion to permit counsel to use an illustrative aid for the purpose of summarizing or illustrating trial testimony, even though the illustrative aid is itself not admitted into evidence); <u>U.S. v. Bray</u>, 139 F.3d 1104, 1111 (6th Cir.1998) (same). TASER's motion in limine is granted in part and denied in part.

### B. the Motion to Exclude Dr. Nelson (doc. no. 98)

### 1. Qualifications

Next, TASER seeks to exclude the reports and testimony of the plaintiffs' pharmacology and biophysics expert, Dr. E. Don Nelson, Ph.D. ("Dr. Nelson"). Although TASER characterizes Dr. Nelson as a "causation" expert, plaintiffs point out that they retained Dr. Nelson only to rebut TASER's "acute alcohol poisoning"

defense theory and that they are not using Dr. Nelson to establish their case in chief.

TASER challenges Dr. Nelson's qualifications by arguing that he is not a "toxicologist" (doc. no. 99 at 19) but offers no explanation as to why it is allegedly necessary to be a toxicologist in order to offer testimony about alcohol abuse. Although Dr. Nelson pointed out in his February 21, 2012 report (doc. no. 93-5) that the Hamilton County Crime Laboratory issued a "Toxicology Report" reflecting a "0.319 g/100 ml." ethyl alcohol concentration for Piskura's 3:04 a.m. blood draw (doc. no. 93-7 at 6), such fact does not mean that Dr. Nelson must be solely a toxicologist in order to discuss such data or that he is "unqualified" to offer testimony about the effects and levels of alcohol abuse. Such matters are well within his expertise.

Plaintiffs point out that Dr. Nelson has a Doctorate in Clinical Pharmacology, completed a three-year fellowship at the National Institute of Alcohol Abuse and Alcoholism, is a "Professor of Clinical of Pharmacology and Cell Biophysics" at the University of Cincinnati College of Medicine, and has over "forty years of professional experience in the areas of alcohol pharmacology, toxicology, and adverse reactions" (doc. no. 125 at 6).[5] Plaintiffs indicate that Dr. Nelson has

---

[5] Pharmacology is generally described as "the study of the body's reaction to drugs" (www.medterms.com) or as the "branch of medicine dealing with the actions of drugs in the body" (www.merriam-webster.com). Pharmacology is defined as: 1) the science of drugs including their origin, composition, pharmacokinetics, therapeutic use, and toxicology; and 2) the properties and reactions of drugs especially with relation to their therapeutic value. Id. Toxicology is defined as the "study of poisons and their effects, particularly on living systems" and overlaps with biochemistry, pharmacology, and pathology. Id.

consulted for decades "with regard to overdose cases" (Id.). Dr. Nelson teaches "alcohol pharmacology, toxicology, and adverse effects" to medical students, residents, and physicians in the University of Cincinnati College of Medicine (see doc. no. 91-5 at 1 "First Report"; 93-5 at 1 "Second Report").

Plaintiffs point out that Dr. Nelson will assist the jurors by explaining certain alleged inaccuracies in TASER's argument about the blood alcohol results. Although TASER argues that Piskura's blood alcohol content ("BAC") allegedly exceeded potentially fatal levels, plaintiffs explains that "these alarming figures have been reached by deliberately confusing the serum readings that are utilized by hospitals with the true BAC levels that are familiar to the courts" (doc. no. 125 at 9, citing Ex. 151 at 52-53). The Court finds that Dr. Nelson has substantial education, training, and experience relevant to issues of alcohol abuse in this case, and that his testimony is well within his area of expertise and will assist the trier of fact in arriving at the truth.

### 2. Factual Basis and Reliability

TASER argues that Dr. Nelson's opinion "lacks a sufficient factual basis" and should be excluded as "unreliable" (doc. no. 99 at 10-15). A district court's role under Rule 702 is to determine whether the proferred evidence "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

Plaintiffs explain that they retained Dr. Nelson to rebut TASER's defense theory that Piskura did not fall to the ground as a result of being hit in the chest with an electric charge from TASER's X26 device, but rather, because at that moment, his elevated blood-alcohol content caused his heart to "seize" (doc. no.

125 at 2). Dr. Nelson maintains that, in his many years of experience in researching the levels and effects of alcohol abuse, the course of events in this case would not cause one to expect that an alcohol overdose occurred. He explains that in the usual case of alcohol overdose, the patient becomes somnolent (lethargic), drowsy, and may pass out (doc. no. 99 at 16, citing Ex. 45 at 3; Ex. 36 at 93). Plaintiffs point out that "TASER's heavy reliance upon authorities dealing with novel scientific theories is misplaced in a case, such as this, that concerns general physiological principles" (doc. no. 125 at 11, 21).

Although it is undisputed that Kevin Piskura was highly intoxicated on the evening of April 18-19, 2008, TASER criticizes Dr. Nelson's report because he does not know "exactly when" Piskura stopped consuming alcohol that evening. TASER complains that Dr. Nelson does not know Piskura's precise BAC at the "exact moment" of cardiac arrest and that his report does not account for all of Piskura's tested blood alcohol levels. TASER complains that Dr. Nelson did not have the precise time for the initial blood draw, but inconsistently also complains that he corrected this in his updated report. TASER urges that Dr. Nelson's opinion is not based on "sufficient facts or data" for purposes of Rule 702 and that his methodology is "unreliable" for purposes of Daubert's gatekeeping standards. Upon review of the reports and related exhibits, the Court disagrees.

As plaintiffs point out, Dr. Nelson's opinion is appropriately based primarily on the blood draw closest to the time of cardiac arrest. In addition to the 3:04 a.m. blood draw, Dr. Nelson also bases his opinion on other evidence, such as eyewitness witness testimony that Piskura had walked out of the bar on his own

without help (doc. no. 125 at 114-15). As for the precise time of the initial blood draw, plaintiffs point out that Dr. Nelson himself noticed a time discrepancy (due to the multiple draws), personally contacted the hospital to ascertain the correct time, and updated his report to reflect accurate data. In its brief, TASER indicates that on April 19, 2008, the first blood draw was taken at 2:30 a.m.; a second draw was taken at 3:04 a.m.; a third draw was taken at 6:17 a.m. (but was never tested for alcohol level, see doc. no. 99 at 7); and a fourth draw was taken at 8:05 a.m. (with a "BAC result" consistent with the 0.319 result from the 3:04 a.m. draw). Amidst a mass of details, TASER loses sight of the fact that these facts undermine its own criticism of Dr. Nelson's report. For example, if the third draw was never tested, it is irrelevant to the analysis. Moreover, Dr. Nelson's verification of accurate blood draw data emphasizes that his testimony is reliably based "upon sufficient facts and data" for purposes of Rule 702.

TASER's criticisms of Dr. Nelson's opinion relate to the weight the jury may give his opinion, not its admissibility. TASER will have full opportunity to question the witness at trial. It is well-settled that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence. Daubert, 509 U.S. at 596. TASER's challenge to Dr. Nelson's anticipated rebuttal testimony provides no basis to exclude his testimony.

### 3. Timeliness

TASER also argues that Dr. Nelson's updated report should be stricken as "untimely" (doc. no. 99 at 10). Rule 26(a) requires that a party make expert

disclosures at the times and in the sequence that the court orders. Fed.R.Civ.P. 26(a)(2)(D). The rule is "intended to limit unfair surprise regarding expert's testimony." Hinkle v. Ford Motor Co., 2013 WL 1992834, *2 (E.D.Ky.). Rule 37(c)(1) provides that "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1).

Plaintiffs indicate they identified Dr. Nelson in the original expert witness disclosures and timely submitted his first expert report on September 1, 2011 (doc. no. 125 at 2).[6] At the beginning of his deposition on February 22, 2012, Dr. Nelson furnished an updated version of his report. Plaintiffs point out that Dr. Nelson promptly identified for defense counsel the few additions and changes that had been made (doc. no. 125 at 5, citing Ex. 151 at 8-9). TASER now asserts that this updated version amounted to a "late" report and is "prejudicial" (doc. no. 99 at 6-7). In essence, TASER is complaining because Dr. Nelson verified correct data regarding the foundation for his opinion, not that he supplied a "new opinion."

Although TASER complains of the corrections in the report, TASER was already well aware of the correct data (i.e. the precise times of the blood draws) and had full opportunity to question Dr. Nelson on his opinion and the updated report. See Roberts ex rel. Johnson v. Galen of Va., Inc., 325 F.3d 776, 783 (6th Cir. 2003) (finding late disclosure harmless where opposing counsel was already

---

[6] Plaintiffs' primary expert disclosures were due September 5, 2011; defendant's primary expert disclosures were due October 22, 2011 (doc. no. 47, Sched. Order).

aware of the substance of the expert's testimony). Notably, TASER does not assert that it was unable to effectively question Dr. Nelson at deposition that day, nor did it seek to reschedule the deposition in light of the updated report. At the hearing, TASER was unable to point to any resulting prejudice, and under these circumstances, any "late" revision of the report was harmless. TASER was fully aware of the multiple blood draws and their results, as well as the substance of Dr. Nelson's opinion. His testimony need not be excluded under Rule 37(c)(1).

C. the Motion to Exclude Plaintiffs' Warnings Expert (doc. no. 101)

Next, TASER seeks to exclude the testimony of plaintiffs' warnings expert William E. Kitzes ("Mr. Kitzes") because 1) he is allegedly "not qualified to render an opinion regarding the adequacy of warnings with respect to ECDs," and 2) his opinions "regarding the hazards of using ECDS and the adequacy of the product's warnings have no factual foundation" (doc. no. 101 at 1-2). TASER argues that this witness is "not a scientist" and that his opinions are neither "reliable nor helpful" (Id. at 2).

While the field of safety management may not be considered a "hard science" like physics, the United States Supreme Court has explained that the principles set forth in *Daubert* apply flexibly to "all expert testimony, including that based on specialized or technical, as opposed to scientific, knowledge." Kumho, 526 U.S. at 147–150. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts." Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005), cert. denied, 546 U.S. 814 (2005)

(quoting Fed.R.Evid. 702 Advisory Committee Notes).

With respect to qualifications, Mr. Kitzes has over six years of experience (1974-1981) as a legal advisor at the Consumer Protection Service Agency ("CPSC"), including several years as Program Manager in the area of sports, recreation, and power equipment (doc. no. 122, Exs. 153-54 curriculum vitae and report). His experience includes evaluation of injury statistics, product use information, and warnings for a wide variety of products and industries (doc. no. 127 at 7). He is certified as a Product Safety Manager and Hazard Control Manager with an Executive Certificate in Safety Management from the American Society of Safety Engineers (Id. at 8). He has taught seminars and lectured widely on product safety management, warnings and instructions, hazard assessment, and risk management (Id.). He served as the Chairman of the Florida Consumers' Council (1993-2007) and has consulted with numerous major manufacturers regarding the adequacy of their instructions and warnings for a wide range of products. The Court finds that this witness has sufficient relevant technical experience to qualify him as an expert witness on principles of safety management, including identification of hazards, risk assessment, and the adequacy of product instructions and warnings.

TASER concedes that Mr. Kitzes is qualified to give an opinion regarding warnings to the general public for consumer products, such as motorized all-terrain vehicles, but argues that he lacks the qualifications and knowledge to opine about the adequacy of warnings given to highly trained law enforcement officers using a "specialized" product like the TASER X26. TASER points out that

Mr. Kitzes is not an expert on ECDs or law enforcement training, nor has he ever tested, examined, or discharged the TASER X26 (doc. no. 102 at 18).

The Court has reviewed Mr. Kitzes' report, which provides his credentials and experience. His experience includes consulting with major manufacturers on the adequacy of instructions and warnings for numerous consumer products, heavy and industrial equipment, building materials, motorized products, and the electrocution risks for linemen installing meter reading devices (doc. nos. 122, Exs. 153-54; 87-6 at 49, Kitzes Dep.). TASER's contention that Mr. Kitzes is only qualified to discuss "non-specialized" consumer products sold to the general public is vague and without merit. The Sixth Circuit Court of Appeals has explained that a "proposed expert witness should not be required to satisfy an overly narrow test of his own qualifications." U.S. v. Barker, 553 F.2d 1013, 1024 (6th Cir. 1977) (quoting Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)); Sadler v. Adv. Bionics, LLC, 2013 WL 1385376, *5 (W.D.Ky.) (same); Hollman v. Taser Int'l, Inc., -- F. Supp.2d --, 2013 WL 864538, *8-9 (E.D.N.Y.) (finding that warnings expert was qualified to offer his opinion about TASER's warning to police officers).

"An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." Dilts v. United Group Services, LLC, 500 Fed.Appx. 440, 445 (6th Cir. 2012), cert. denied, 133 U.S. 2022 (2013) (citing Surles ex rel. Johnson v. Greyhound Lines, Inc., 474 F.3d 288, 293–94 (6th Cir. 2007)). In Dilts, the Sixth Circuit Court of Appeals rejected the defendant's argument that plaintiff's accident

reconstruction expert should be excluded because he had "never worked on cases involving the operation of a crane nor has he specifically reviewed accident reconstruction with respect to the rigging or lifting of materials." Id. at 445. See also, e.g., In re Zyprexa Products Liability Litigation, 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007) (explaining that if an expert has education and experience "in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent") (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 80 (2d Cir. 1997)).

Moreover, assertions that a witness lacks particular experience, generally go to the weight, not the admissibility, of testimony. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995) (affirming because engineer had sufficient "experience, training, or education" to testify regarding ventilation of glue fumes, and rejecting defendant's suggestion that such witness had to have further specialized education in "fume dispersal and air quality"); Emig v. Elec. Home Prod. Inc., 2008 WL 4200988, *5 (S.D.N.Y.) (finding that a lack of experience "in the particular area of consumer products" goes to weight, not admissibility). A proposed expert witness must show that he has reliably applied his particular knowledge and expertise to the specific facts of the case. Mr. Kitzes' description of his broad-based experience—which includes evaluating warnings on a multitude of products—provides a sufficient link between his technical experience and his opinion to satisfy the requirements of Rule 702. The Court is satisfied that Mr. Kitzes' experience and knowledge of this subject area will assist the jury and is

admissible. Although TASER may challenge the depth or breadth of Mr. Kitzes' knowledge in the field of safety management or his reasoning in reaching his conclusions, the Court finds that these challenges go to the weight of his testimony and are properly reserved for cross-examination.

TASER further argues that Mr. Kitzes' opinion lacks a "factual foundation" and spends much of its lengthy briefs disputing the underlying scientific evidence about the alleged risks of TASER chest shots. For example, TASER claims that Mr. Kitzes "lacks any evidence of a hazard or risk that a TASER ECD can cause the cardiac rhythm of VF [ventricular fibrillation] in a human" (doc. no. 102 at 7). Plaintiffs point out that Dr. Zipes will testify about the medical effects of ECD chest shots to a person and the medical literature as of April 2008. Plaintiffs explain that Mr. Kitzes will then testify within his own safety management expertise as to his opinion regarding TASER's instructions and warning to officers about use of the X26 device.[7]

TASER acknowledges that Mr. Kitzes will rely on Dr. Zipes' causation opinion, but complains that he ignores "the flaws and limitations in Zipes' analysis that were identified in his deposition" (doc. no. 102 at 21). For example, TASER criticizes Dr. Zipes for indicating that "there was debate as to whether ECDs could

---

[7] When asked at deposition if the TASER probes launched by Officer Robinson, had "impacted" Piskura, Mr. Kitzes responded "Based on what I read, yes." (doc. no. 87-6 at 44, Kitzese Dep. at 90). TASER mischaracterizes this response as an admission that he "cannot opine that an electrical circuit . . . was ever completed" (doc. no. 136 at 14). TASER is attempting to challenge the safety management expert by disputing underlying factual assumptions that are contested by the parties.

cause VF in humans" (doc. no. 102 at 21). Plaintiffs point out that the United States Supreme Court has specifically rejected the notion that a theory must be "generally accepted" for testimony to be admissible under Rule 702. (doc. no. 127 at 5). See <u>Daubert</u>, 509 U.S at 587-88 ("Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility."). This Court has already denied TASER's motion in limine regarding Dr. Zipes' testimony. Although TASER criticizes Mr. Kitzes for relying on Dr. Zipes' opinion, such argument pertains largely to weight, rather than admissibility. At trial, TASER will be able to point out that Mr. Kitzes' opinion is based on certain facts or assumptions that TASER challenges. TASER will have ample opportunity to cross-examine Mr. Kitzes and Dr. Zipes on everything they did and did not consider in reaching their conclusions.

Plaintiffs assert that TASER's disjointed argument essentially misrepresents the nature of Mr. Kitzes' opinion. He is offered as an expert on the adequacy of product warnings, not as a medical expert on causation. Plaintiffs point out that Mr. Kitzes has been asked to assume certain facts and then to apply the recognized methodology of "product safety management" to the facts of this case. Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed.R.Evid. 703; <u>Daubert</u>, 509 U.S. at 592 (citing Rule 703 and explaining that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation . . . this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the

expert's opinion will have a reliable basis *in the knowledge and experience of his discipline*") (italic added). Here, Mr. Kitzes' preliminary report (doc. no. 122-5 at 1-16) identifies the accepted principles of product safety management and applies them to the facts of the present case.

TASER's contention (at doc. no. 102 at 21) that Kitzes "wholly relies" on Dr. Zipes' causation opinion is not accurate. Plaintiffs point out that Mr. Kitzes also bases his opinion on the version of facts supplied in the police report and depositions, including Officer Robinson's testimony that Piskura was walking toward him when he fired the TASER X26 device directly at Piskura's chest (doc. no. 127 at 9). He reviewed TASER training materials for Versions 10-14, including an illustration of an officer aiming the ECD device directly at a person's chest (Id. at 4, illustration from TASER training slide). Mr. Kitzes also reviewed medical and scientific literature, including a 2005 U.S. Army report and TASER-funded research by Drs. Tchou and Lakkireddy regarding the medical risks of TASER chest shots to a person (Id. at 9; see also, doc. no. 87-6 at 15-20, Kitzes Dep. at 38-44). The latter research, according to plaintiffs, "established more than two years before this incident that the Model X26 causes cardiac capture in test animals, and specifically advised TASER to avoid chest shots to minimize risk of cardiac arrest" (Id. at 11). The Court finds that, for purposes of Rule 702, Mr. Kitzes has reviewed sufficient facts and data to provide a basis for his opinion.

Although TASER asserts that Mr. Kitzes "does not know what information is in TASER's Training Version 13 DVD" (doc. no. 102 at 25, citing Ex. 27, p. 99), TASER mischaracterizes the testimony. At deposition on March 9, 2012, Mr. Kitzes

indicated he had not seen the Version 13 training DVD "recently" and that he would have "to go back and look at it" in order to respond to detailed questions about it (doc. no. 87-6, Kitzes Dep. at 99). In any event, plaintiffs point out that TASER acknowledges it gave no warnings about firing the ECD at a person's chest until *after* the incident at issue. Mr. Kitzes indicates he reviewed TASER's training materials for Versions 10-14, including the "TASER Instructor Certification Course for X26/M26 Version 13" (doc. no. 122-5 at 15, 24). His need to refresh his memory with respect to the Version 13 training DVD does not preclude his opinion that TASER should have given appropriate instructions and warnings about the risks of X26 ECD chest shots when deploying the X26 in dart-mode.

TASER further criticizes Kitzes' opinion as "made-for-litigation." See Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007) ("expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution"); Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 408 (6th Cir. 2006) (courts "have considered whether an expert's testimony relates to matters growing naturally and directly out of their own research, or whether the expert's testimony has been developed for the purposes of litigation"). In light of his years of experience in evaluating and developing warnings for various products, Mr. Kitzes' anticipated testimony flows naturally from his past technical work in safety management and risk assessment. Again, TASER's criticism pertains to the weight to be given the testimony by the jury, rather than its admissibility. This Court finds that Mr. Kitzes may offer an opinion

within his expertise and knowledge, which the jury may then weigh accordingly.

TASER also complains that Kitzes' opinion concerns an ultimate issue for the jury (doc. no. 122-5 at 20-21). While the issue of whether the defendant gave adequate warnings usually is a jury question, Rule 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed.R.Evid. 704, Advisory Committee Notes ("the so-called 'ultimate issue' rule is specifically abolished").

### D. the Motion to Exclude Certain Opinions of Medical Examiner Dr. Obinna Ugwu (doc. no. 97)

Finally, TASER moves to exclude certain "expert" opinion testimony by medical examiner Dr. Obinna R. Ugwu, M.D., the forensic pathologist who conducted the post-mortem examination of Kevin Piskura.

Under Ohio law, a coroner is empowered to investigate facts "concerning the time, place, manner and circumstances of the death." State ex rel. Blair v. Balraj, 69 Ohio St.3d 310, 312 (1994), receded from on other procedural grounds by Perez v. Cleveland, Ohio, 78 Ohio St.3d 376, 378 (1997); State v. Williams, 2006 WL 747136, *5 (Ohio App. 5 Dist.). The coroner has a statutory duty to examine any available information relating to the death, including police reports and witness statements. State v. DeBartolo, 2012 WL 3129795, ¶ 55 (Ohio App. 8 Dist.); State v. Jacks, 63 Ohio App.3d 200 (8th Dist. 1989). Here, the records reviewed by Dr. Ugwu indicated that on the evening of April 18-19, 2008, Piskura had been in a fight, was highly intoxicated, and had been "tased" at close range in the chest by police. By

law, a coroner is required to consider "all attendant circumstances" in determining the cause and manner of death. Balraj, 69 O.St.3d at 312.

As official medical examiner ("deputy coroner"), Dr. Ugwu personally examined Piskura's body, including the condition of the heart (see doc. no. 93-7 at 3-5 report of "PostMortem Examination of the Body of Kevin C. Piskura," dated April 25, 2008). [8] Pursuant to state law, and after an extensive five-month investigation, Dr. Ugwu prepared the official report of his findings. His report, dated September 9, 2008, attributed the "Cause of Death" to:

> Anoxic encephalopathy and multiple organ failure due to sudden cardiac arrhythmia, associated with acute alcohol intoxication, recent physical exertion, and recent history of application of conductive electrical device.

(doc. no. 93-7 at 2). The "Manner of Death" was given as "undetermined" (Id.). At deposition, Dr. Ugwu explained that, after five months of investigation into the cause of death, he could not "rule out" the effects of the TASER device as a factor, but also could not state to a reasonable degree of medical certainty that it did in fact cause Piskura's death.

In Ohio, a coroner may testify as an expert witness to assist the jury in determining the cause of death. Vargo v. Travelers Ins. Co., 34 Ohio St.3d 27, 30 (1987), receded from on procedural grounds by Perez, 78 Ohio St.3d at 378. "Medical examiners may qualify as expert witnesses who may express opinions on matters within their scope of expertise." TASER Int'l, Inc. v. Kohler, Chief Med. Examr. of Summit Cty., 2009 WL 826416, ¶ 25 (Ohio Ct.App.) (indicating that "the

---

8 TASER acknowledged at the hearing that there is no question as to the "chain of custody" of the decedent's heart.

testimony of a medical examiner who is qualified as an expert witness in the field of forensic pathology must nonetheless be based on 'reliable scientific, technical, or other specialized information' to the same extent as any other expert witness," citing Ohio Evid.R. 702). In federal court, "the admissibility of expert testimony is governed by federal law." <u>Fontenot v. TASER Int'l, Inc.</u>, 2011 WL 2535016 (W.D.N.C.) ("Although state law controls the substantive tort issues in this diversity action, the admissibility of expert testimony is governed by federal law.") (citing <u>Bryte ex rel. Bryte v. Am. Household, Inc.</u>, 429 F.3d 469, 476 (4th Cir. 2005), cert. denied, 547 U.S. 1129 (2006)); <u>Stutzman v. CRST, Inc</u>., 997 F.2d 291, 295 (7th Cir. 1993) (same).

TASER's motion does not challenge Dr. Ugwu's qualifications as an experienced forensic pathologist (he has performed over 1,500 autopsies), and TASER conceded at the hearing that Dr. Ugwu is well qualified in such medical specialty.[9] TASER does, however, argue that Dr. Ugwu is not an "expert" on TASER probe signature marks, electricity, or the effects of ECDs on the human body (doc. no. 100 at 3), and therefore, his "causation opinion" should be excluded as "outside" his expertise. TASER does not dispute that Piskura suffered cardiac arrhythmia, but seeks to exclude Dr. Ugwu's testimony to the extent that he "associated" the sudden cardiac arrhythmia with application of the ECD device

---

[9]  Forensic pathology is defined as the "determination of the cause and manner of sudden, unexpected, and violent deaths" and "represents the practice of a distinct and recognized medical specialty." Delonix et al., Forensic Pathology: Principles and Practice, xxiii (2005).

as a "contributing cause." (doc. no. 132 at 16 "TASER requests that his unfounded ECD causation contribution opinion and testimony be excluded."). [10] TASER argues that Dr. Ugwu's opinion about contributing causes was not made to a reasonable degree of medical certainty and that his reliance on the "temporal proximity" between the tasing and Piskura's collapse is a "faulty methodology" (doc. no. 100 at 4-5, 12). TASER points out that Dr. Ugwu only found one probe mark on Piskura's chest, and thus, cannot say that a "completed electrical circuit" occurred in this case (Id. at 14).

In their brief, plaintiffs respond that they intend to elicit Dr. Ugwu's testimony regarding the cause of death (doc. no. 126 at 2). They argue that Dr. Ugwu is well qualified as a experienced forensic pathologist to give his opinion as to the cause of death and that Ohio law provides for a rebuttable presumption as to the correctness of his findings as official medical examiner (Id. at 6-8). Plaintiffs cite Ohio R.C. § 313.19, which prescribes the presumptive value to be accorded a coroner's verdict and creates a rebuttable presumption that the coroner's opinions are accurate:

> "The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death."

[10] TASER does not seek to exclude Dr. Ugwu's testimony to the extent he indicates that alcohol intoxication was a contributing cause of Piskura's death.

"[O]ne function of R.C. 313.19 is to set forth the presumptive value of a coroner's determination as evidence in civil and criminal cases in which the cause, manner, and mode of death are at issue." Cultrona v. Nationwide Life Ins. Co., --- F.Supp.2d ----, 2013 WL 1284344 (N.D.Ohio) (J. Lioi) (quoting Kohler, 2009 WL 826416, at *10). "The coroner's factual determinations concerning the manner, mode, and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." Vargo, 34 Ohio St.3d at 29; Perez, 78 O.St.3d at 377.11

In their response, the plaintiffs discuss the lengthy investigation conducted by Dr. Ugwu. They assert that Dr. Ugwu's deposition testimony shows that he understands enough about the functioning of ECDs and had reviewed enough relevant medical literature and other evidence regarding ECDs and the incident to offer his contributing causation opinion. This "other" evidence includes the 11-second TASER video which shows Piskura rolling on the ground after Officer Robinson discharged the X26 device at him in dart-mode (Id. at 11). Plaintiffs argue that the "temporal proximity" is simply one factor that was considered as part of Dr. Ugwu's differential diagnosis in "ruling in" and "ruling out" various possible causes in order to determine the cause of death (Id. at 15).

In its reply, TASER essentially repeats its arguments, but does point out that

---

11 The record does not reflect that Dr. Ugwu's findings were challenged in a special statutory proceeding pursuant to R.C. § 313.19 in state court.

the "manner of death was officially listed as "undetermined" (doc. no. 132 at 8, fn. 3). TASER further argues that Ohio R.C. § 313.19 and the holding of <u>Vargo</u> are not relevant to the issue of admissibility under Rule 702 in federal court, but contends that even if they do apply, TASER has pointed to sufficient "competent credible evidence" to rebut Dr. Ugwu's opinion as to the contributing causes of death (<u>Id</u>.).

At the hearing, plaintiffs' counsel indicated that, since the "manner of death" was officially listed as "undetermined," Dr. Ugwu would <u>*not*</u> be testifying as to "causation," that his testimony should come in merely as "coroner," and that he will merely testify as to what he did in the autopsy and what he observed. Plaintiffs' counsel indicated that Dr. Ugwu will testify only as to his "personal observations" and to matters within his expertise as a forensic pathologist. For example, Dr. Ugwu's report of his findings from the postmortem examination indicates (in the section entitled "Evidence of Injury") that he observed a puncture wound and "two ¼ inch oval, reddish brown abrasions" on Piskura's chest (doc. no. 93-7 at 3). His report includes a detailed description of his examination of Piskura's cardiovascular system and microscopic examination of Piskura's heart (<u>Id</u>.). TASER concedes that Dr. Ugwu "can offer testimony on facts" (doc. no. 97 at 1).

For the reasons already discussed herein and at the hearing, the Court finds that Dr. Ugwu may testify about how he conducted the autopsy and his observations and medical findings during that process. Dr. Ugwu's official report may be introduced, and he may explain the contents of such report. TASER will have full opportunity to question Dr. Ugwu about his findings and the basis for

them. TASER's motion in limine is therefore denied, with one exception. To the extent Dr. Ugwu testified at his deposition that he sought the opinions of other unnamed cardiologists during his investigation into the cause of death, TASER correctly points out that Dr. Ugwu may not repeat the verbal opinions of other unidentified physicians in his own testimony as hearsay. He may, of course, discuss the authorities and information upon which he relied in forming his report.

Accordingly, the Court rules on TASER's motions as follows:

A. the motion in limine regarding Mr. and Mrs. Piskura and Dr. Steven Horn (doc. no. 95) is GRANTED in part and DENIED in part;

B. the motion in limine regarding Dr. Don Nelson (doc. no. 98) is DENIED;

C. the motion in limine regarding William E. Kitzes (doc. no. 101) is DENIED; and

D. the motion in limine regarding Dr. Obinna Ugwu (doc. no. 97) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

s/Herman J. Weber
Herman J. Weber, Senior Judge
United States District Court